AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | |
|  | ) | Case No. 18-MJ-02965-TORRES |
| EVELIO SUAREZ, | ) | |
|  | ) | |
|  | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2013 - 2015__ in the county of __Miami-Dade__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1956(h) | Conspiracy to Commit Money Laundering |
| 18 U.S.C. § 215 | Bribery of a Bank Employee |
| 18 U.S.C. § 1512 | Obstruction of Justice |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Timothy Lawler, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 06/21/2018

_____
*Judge's signature*

City and state: Miami, Florida

U.S. Magistrate Judge Edwin G. Torres
*Printed name and title*

## Affidavit in Support of Complaint

I, Timothy Lawler, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") Miami Field Office and have been employed in this capacity since August of 1999. I am currently assigned to the public corruption unit. I have been involved in numerous investigations involving fraud and money laundering.

2. This affidavit is submitted in support of a criminal complaint charging the defendant Evelio Suarez with: (i) conspiracy to engage in money laundering, in violation of Title 18, United States Code, Sections 1956(a) and (h); (ii) theft of government money, in violation of Title 18, United States Code, Section 641; (iii) bribery of a bank employee, in violation of Title 18, United States Code, Section 215; and (iv) obstruction of justice, in violation of Title 18, United States Code, Section 1512.

3. The facts contained within this affidavit are both personally known by me, as well as relayed to me by others, including members of law enforcement and other witnesses. This affidavit sets forth only those facts that I believe are necessary to establish probable cause. As such, I have not included each and every fact known about this investigation.

### Overview

4. From at least as early as 2010, continuing through in or around 2015, the defendant knowingly agreed and conspired with others to launder the proceeds of healthcare fraud, identity theft tax refund fraud, mortgage fraud, and other fraud at check-cashing stores that the defendant controlled in South Florida through nominee owners.

5. The essence of the scheme was that defendant allowed scammers to cash checks from fraudulent activity made out in the names of "ghosts"—either nominee individuals (often

individuals who had fled to Cuba) or individuals whose identities had been stolen. In doing so, the defendant allowed the scammers to conceal their involvement in receiving the proceeds of the fraud.

6. Because the defendant knew the funds came from illegal sources, the defendant charged an additional percentage on top of the standard fee charged by the check-cashing stores. The defendant typically charged a personal fee of between ten percent to thirty percent depending on the type of fraudulent proceeds.

7. During a sample period of 2013 and 2014 (the "relevant period"), the defendant's check-cashing stores cashed nearly $500 million in checks.[1] Based on a review of those checks, a majority of the checks at the defendant's stores appear to come from healthcare fraud, identity theft, mortgage fraud, and other fraudulent activity.[2]

## Background – The Defendant's Check Cashing Stores

8. During the relevant period, the defendant controlled three stores in South Florida operated through nominee owners: Minimalist Solutions, Inc. ("Minimalist"), Don Koky, Enterprises Corp. ("Don Koky"); and Doger Group Inc. ("Doger") (together, the "nominee check-

---

[1] The government restricted its analysis to this time period given the massive volume of the checks cashed at the defendant's stores in that period. The government identified approximately 150,000 checks cashed at the defendant's check-cashing store during the relevant period. It is a highly laborious and timely process to input these checks manually into a spreadsheet for analysis.

[2] As for other fraudulent activity, many of the checks cashed come from companies that appear to be engaged in workers' compensation fraud in the construction industry. For example, there are repeat checks from the same companies with construction or contracting name often for large sums (e.g., each over $40,000). In South Florida, it is common practice for construction companies and contractors to pay workers through shell companies in order to hire undocumented workers and avoid paying workers compensation. This activity, although prevalent at the store, is not detailed in this affidavit. The government is aware that the defendant provided information to a workers' comp task force about workers' comp related fraud during the relevant period.

cashing stores").[3]  The three stores have the following similarities: (i) a large number of checks for massive amounts (many exceeding $100,000)[4]; (ii) a large number of checks made payable to the same payees cashed in each of the stores; and (iii) all three stores banked at the same financial institution—Peoples Credit Union ("PCU")—headquartered in Pembroke Pines.

*Minimalist — $305 Million in Checks*

9.  Minimalist was a check-cashing store located at 3118 West 76 Street in Hialeah, Florida. During the relevant period, Minimalist cashed approximately $305 million in checks. Below is a sample of some of the largest checks sorted by type of fraud scheme (e.g., health-care fraud, identity theft tax refund fraud, or mortgage fraud) cashed at Minimalist:

| *Minimalist -- Health Care Fraud Checks* | | | |
|---|---|---|---|
| **Date** | **Amount** | **Payor** | **Payee** |
| 5/9/2014 | $429,723 | OptumRx | Pronto Pharmacy Group |
| 3/18/2014 | $346,037 | Cashier's Check | B Plus H Care |
| 5/13/2014 | $245,992 | OptumRx | Pronto Pharmacy Group |
| 11/5/2013 | $239,500 | Caremark | Ultra Medical Services |
| 4/21/2014 | $201,322 | OptumRX | Pronto Pharmacy Group |
| 3/4/2014 | $199,968 | CMS Medicare | Get Well Soon Corp. |
| 10/16/2013 | $192,362 | MDCO | 8th Street Pharmacy Corp. |
| 2/18/2014 | $189,736 | Caremark | Better Life Pharmacy |
| 3/11/2014 | $188,187 | CMS Medicare | Get Well Soon Corp. |
| 3/7/2014 | $187,744 | CMS Medicare | Get Well Soon Corp. |

---

[3]  The defendant operated these stores through nominee owners during the relevant period because state authorities arrested the defendant in 2012 for laundering the proceeds of workers' compensation fraud schemes. The defendant's probation conditions prohibited his involvement in check-cashing stores.

[4]  It is particularly unusual for a check-cashing store to cash checks over $100,000. Most people with large checks use the services of banks. Also, most check-cashing stores are leery of cashing such a check because a bounced check for this amount could wipe out the store's profits.

3

| Minimalist -- Identity Theft Tax Refund Fraud Checks | | | |
|---|---|---|---|
| Date | Amount | Payor | Payee |
| 7/24/2013 | $153,284 | U.S. Treasury Tax Refund | J.C. |
| 7/26/2013 | $151,192 | U.S. Treasury Tax Refund | D.D. |
| 5/24/2013 | $150,873 | U.S. Treasury Tax Refund | L.A. |
| 7/12/2013 | $150,809 | U.S. Treasury Tax Refund | M.P. |
| 8/2/2013 | $135,708 | U.S. Treasury Tax Refund | M.B. |

| Minimalist -- Mortgage Fraud Checks | | | |
|---|---|---|---|
| Date | Amount | Payor | Payee |
| 5/9/2013 | $377,500 | R.M. | Certified Capital Services |
| 1/30/2013 | $125,107 | Torre Rosa Title | Certified Capital Services |
| 1/28/2013 | $99,129 | Torre Rosa Title | Certified Capital Services |
| 1/28/2013 | $51,745 | Torre Rosa Title | Certified Capital Services |
| 1/29/2013 | $49,278 | Torre Rosa Title | Ace Vestors Group |

*Don Koky -- $83 Million in Checks*

10. Don Koky was a check-cashing store located at 1840 W. 49 Street in Hialeah, Florida. During the relevant period, Don Koky cashed approximately $83 million in checks. Below is a sample of some of the largest checks cashed at Don Koky:

| Don Koky -- Fraudulent Checks | | | |
|---|---|---|---|
| Date | Amount | Payor | Payee |
| 7/18/2014 | $329,121 | CMS Medicare | Demosthenes Home Health |
| 7/22/2014 | $219,528 | CMS Medicare | Demosthenes Home Health |
| 7/3/2014 | $203,267 | CMS Medicare | Demosthenes Home Health |
| 9/17/2013 | $198,942 | Medco | 8th Street Pharmacy Corp |
| 7/24/2014 | $188,141 | CMS Medicare | Demosthenes Home Health |
| 7/23/2014 | $176,379 | CMS Medicare | Demosthenes Home Health |
| 7/11/2014 | $172,231 | CMS Medicare | Demosthenes Home Health |
| 8/9/2013 | $149,000 | U.S. Treasury Tax Refund | E.M. |

4

| *Don Koky – Fraudulent Checks* | | | |
|---|---|---|---|
| **Date** | **Amount** | **Payor** | **Payee** |
| 9/18/2013 | $148,250 | J.C.N. | J.C.N. |
| 11/13/2013 | $117,555 | MDCO | Harmony Pharmacy |

*Doger — $87 Million in Checks*

11.     Doger was located at 1544 W. 49 Street in Hialeah, Florida.  During the relevant period, Doger cashed approximately $87 million in checks.  Below is a sample of some of the largest checks cashed at Doger:

| *Doger – Fraudulent Checks* | | | |
|---|---|---|---|
| **Date** | **Amount** | **Payor** | **Payee** |
| 9/27/2013 | $234,250 | J.C.N. | J.C.N. |
| 10/6/2013 | $149,512 | MDCO | Harmony Pharmacy |
| 1/30/2013 | $125,106 | Torre Rosa Title | Certified Capital Services |
| 12/9/2013 | $118,977 | MDCO | 8th Street Pharmacy Corp. |
| 2/4/2013 | $115,246 | U.S. Treasury Tax Refund | R.G. |
| 7/14/2014 | $105,829 | Prime Therapeutics | Zuy Pharmacy Discount |
| 6/16/2014 | $104,534 | Prime Therapeutics | Zuy Pharmacy Discount |
| 7/3/2014 | $104,491 | Optumrx | Lili Pharmacy & Discount |
| 5/19/2014 | $104,103 | OptumRx | Zuy Pharmacy Discount |
| 1/28/2013 | $99,128 | Torre Rosa Title | Certified Capital Services |

**The Defendant Controlled the Nominee Check-Cashing Stores**

12.     Witnesses and financial records confirm that the defendant controlled all three check-cashing stores.

*Confidential Witness 1 ("CW1"):  Defendant Bribed a Bank Officer Relating to the Nominee Check-Cashing Stores*

13.     CW1 is a former bank compliance officer convicted of bribery of a bank official in 2016.

5

14. CW1 explained that the defendant approached him/her during the relevant period about obtaining PCU monthly bank statements for Minimalist, Don Koky, and Doger. The defendant offered CW1 approximately $400 each week for copies of PCU bank statements for each of nominee check-cashing stores. The defendant explained that he received a percentage of revenue from the stores and wanted to ensure that the nominee owners did not short him.

15. CW1 agreed and provided monthly statements to the defendant for each of the check-cashing stores. In exchange, the defendant paid bribe payments to CW1's spouse in cash at one of the defendant's check-cashing stores.

16. CW1 also agreed to provide short-term cash advances from PCU to each of the defendant's check-cashing stores. CW1 authorized short-term cash advances so that the nominee check-cashing stores would have sufficient cash to pay out checks. In particular, CW1 agreed to lend substantial funds (greater than $100,000) from PCU in exchange for cash payments. The check-cashing stores would typically cover this cash outage in a few days by depositing large volume of checks. The defendant specifically assured CW1 that he would cover any shortages for the nominee check-cashing stores.

17. On one occasion, the defendant approached CW1 about cashing a $1 million check. The defendant offered to pay CW1 thirty percent of the value of the check. CW1 declined to cash this check.

*Confidential Witness 2 ("CW2"), Confidential Witness 3 ("CW3") & Confidential Witness ("CW4"): Defendant Controlled the Nominee Check-Cashing Stores*

18. Starting in or around late 2012, CW2 and the defendant agreed to have CW2 act as the nominee owner for the Minimalist store (then under a different name) for a short period. The defendant had previously owned and controlled the store at this location. CW2 said that he/she agreed to have the defendant continue to bring in clients to the store in exchange for a split of the

profits. CW2 said that he/she maintained the same tellers that had previously worked for the defendant. CW2 advised that the tellers had strong loyalty to the defendant.

19. From the outset, CW2 told the defendant not to cash tax-refund checks at the store. However, shortly after working together, CW2 discovered that the store cashed a tax-refund check worth several tens of thousands of dollars. CW2 reiterated to the defendant not to cash these checks. CW2 later discovered the defendant cashed hundreds of thousands of tax-refund checks and subsequently ended the relationship with the defendant.

20. CW2 recalled one occasion that the defendant provided Louis Vuitton shoes as a gift to CW2. Records show that the defendant has spent over $150,000 at Louis Vuitton since 2012. CW2 recalled that the shoe size did not fit and that Louis Vuitton would not accept the return. CW2 observed the defendant make a cash payment to a Louis Vuitton employee to accept the return.

21. Starting in or around 2013, CW3 acted as the nominee owner for the Minimalist store. CW3 said that he/she agreed to have the defendant continue to bring clients to the store in exchange for a split of Minimalist's profits. CW3 maintained the same tellers that had previously worked for the defendant who had strong loyalty to the defendant.

22. CW3 said he/she agreed on a fifty/fifty split of Minimalist profits with the defendant. CW3 explained that the profits came from the fee charged by the store for cashing checks (approximately one to two percent). CW3 said that he/she would typically write the defendant a check for defendant's share of profits to a company called I&T Proffessional [sic] Service ("I&T Service"). I&T Service is a dissolved company registered with the State of Florida in the defendant's name.

7

23. The United States has obtained copies of the I&T Service bank account. There are a number of checks cashed in this account from Minimalist for "consulting fees." For example, there are three checks from Minimalist to I&T Service totaling $13,360 all dated April 3, 2014. The checks have what appears to be the defendant's signature on the back.

24. CW3 explained that the defendant had a similar profit-sharing agreement with Doger and Don Koky. CW3 said the defendant complained that CW3 would not pay him in cash for his share the way that the nominees at Don Koky and Doger did.

25. CW4 served as the nominee owner of the defendant's store prior to 2012. CW4 has close knowledge of the defendant's personal activities. CW4 said that the defendant controlled multiple check-cashing stores in 2013. CW4 advised that the defendant used to maintain 14 or 15 prepaid cell phones to communicate with co-conspirators, such as tellers and others who brought fraudulent checks. CW4 said that the defendant would throw away the phones every month and buy new ones for communication. CW4 said that the tellers had deep loyalty to the defendant. CW4 said that the defendant always drove luxury vehicles, like Aston Martin, Maserati, Mercedes, and BMW. CW4 said that the defendant had 32 watches, primarily Rolex and Cartier.

*Financial Records: Defendant Used Funds from the Nominee Check-Cashing Stores to Acquire Real Estate*

26. During the course of the fraud, the defendant acquired a number of real-estate properties in South Florida since 2013 through a shell corporation – East Coast Property Acquisition LLC ("East Coast Property"). East Coast Property listed the defendant's attorney as the manager in the Florida Division of Corporation records. The defendant acquired these properties using funds from the nominee check-cashing stores.

27. East Coast Property acquired a property in Sunset Lakes in Miramar – 4556 SW 186 Way. In 2014, Don Koky transferred approximately $324,900 in funds that ultimately went to the purchase of the property.

28. East Coast Property acquired an additional property in Sunset Lakes in Miramar – 4128 SW 195 Terrace. In 2014, Minimalist transferred approximately $57,000 in funds that ultimately went to the purchase of the property.

29. East Coast Property acquired an additional property in Miramar—3400 SW 185 Avenue. In 2015, Don Koky transferred approximately $200,000 in funds that ultimately went towards the purchase of the property.

## The Defendant Knowingly Cashed Fraudulent Checks

30. Witnesses confirm that the defendant knowingly cashed fraudulently obtained tax refund fraud, mortgage fraud, and health care fraud checks at the nominee check-cashing stores in exchange for a personal payment.

*Confidential Witness 5 ("CW5"): Defendant Knowingly Cashed Fraudulent Mortgage & Tax Refund Checks*

31. CW5 was convicted of an identity theft tax refund fraud scheme in 2016.

32. CW5 said that he/she started cashing checks with the defendant in or around 2010. CW5 said that he/she initially brought mortgage-fraud related checks to the defendant. CW5 explained that CW5 wrote the checks payable in the names of individuals; typically, individuals that never entered the store. CW5 said the defendant charged between six and thirty percent for cashing these mortgage fraud checks. CW5 explained that he/she brought checks as large as $500,000 to the defendant. CW5 believed that he/she had brought approximately $4,000,000 in mortgage fraud checks to the defendant.

33. In or around 2013, CW5 met with the defendant at the Minimalist store in Miami. CW5 said that he/she obtained fraudulent tax refund checks—each for approximately $150,000 and discussed cashing these checks. CW5 and the defendant agreed to cash these checks in exchange for a 30% fee for the defendant on the checks.

34. CW5 explained that he/she brought the checks personally to the defendant. CW5 said the defendant would typically give CW5 cash at the back of the store. On one occasion, the defendant gave CW5 approximately $300,000 in cash outside of People's Credit Union. CW5 also said that sometimes the tellers would give cash back to the defendant outside the store. CW5 explained that CW5 would sometimes tip the tellers as much as $1,000 outside the store.

35. CW5 further stated that he/she only communicated with the defendant via prepaid cell phones. CW5 said that he/she saw the defendant with 4 or 5 prepaid phones at a time.

36. Bank records show five different tax refund checks cashed at Minimalist each for approximately $150,000 and one tax refund check cashed at Don Koky for $150,000 between May and August 2013 (as shown in paragraphs 9 and 10). Law enforcement has contacted a sample of individuals whose names appear on the checks. Each confirmed they were victims of identity theft. Moreover, law enforcement has reviewed the driver's licenses on file at the check-cashing store for these checks and all of them are fake.

*Confidential Witness 6 ("CW6"): Defendant Knowingly Cashed Fraudulent Health Care & Tax Refund Checks*

37. CW6 was convicted of money laundering in 2014.

38. CW6 said that he/she met the defendant in or around 2011. CW6 said that the defendant got into legal trouble in or around 2012 and had nominee owners at Minimalist, Don Koky, and Doger.

39. CW6 said that he/she initially brought construction company checks to the defendant. CW6 said that he/she set up shell companies that construction companies used to pay workers who did not have legal status and avoid paying workers' compensation. CW6 brought these checks from construction companies to the defendant to cash.

40. CW6 later asked the defendant about cashing health care checks. CW6 had a meeting with the defendant and the defendant agreed to cash these checks for a ten percent fee (on top of the check cashing store's percentage of one a half to two percent). CW6 said that he/she split the ten percent fee with the defendant.

41. CW6 said that he/she brought in checks from several different pharmacies, including, among others, the following pharmacies: Sun View Pharmacy, Latin Quarter Pharmacy, Quality Pharmacy, R-2 Quality Pharmacy, Emergencia Pharmacy, and Discount Pharmacy. CW6 said that he/she brought in numerous individual checks valued at $50,000 or higher. CW6 said that he/she ultimately was bringing in approximately $800,000 in pharmacy checks per week. CW6 explained that the nominee owners of these pharmacies had typically fled to Cuba. CW6 said that he/she often brought the checks directly to the defendant.

42. Law enforcement has reviewed checks cashed in the name of Sun View Pharmacy. Minimalist cashed approximately 55 checks for Sun View Pharmacy totaling approximately $1.5 million from April 2014 through July 2014. Don Koky cashed approximately 36 checks for Sun View Pharmacy totaling approximately $1.1 million from March 2014 through August 2014.

43. CW6 said that he/she also brought fraudulent tax refund checks to the defendant. CW6 acknowledged that he/she did not have real identification documents or authorization from the people whose names appeared on the checks. CW6 said that the defendant would make fake identification documents if necessary for the checks.

44.  CW6 said that, on occasion, the defendant asked CW6 to bring checks from one of the defendant's check-cashing stores to another because the store had too many checks.

*Confidential Witness 7 ("CW7"): Defendant Knowingly Cashed Health Care Fraud Checks*

45.  CW7 was convicted of health care fraud in 2016.

46.  CW7 said that he/she brought fraudulent health care fraud checks to another check-cashing store in or around 2013 and 2014. There was an issue in cashing around $100,000 worth of these checks. The owner of the other check-cashing store explained that the defendant had issues cashing these checks and brought CW7 to meet the defendant to explain the situation.

47.  CW7 met the defendant at Versailles restaurant in Miami, Florida. The defendant arrived at the store in Louis Vuitton attire and met both CW7 and the other check-cashing store owner. The defendant told CW7 that the defendant had an issue cashing CW7's checks. The defendant said that he typically charged ten or more percent for health care fraud checks, but he offered to cash the checks for less than ten percent until CW7 made up the loss amount. CW7 declined to cash these checks with the defendant.

*Confidential Witness 8 ("CW8"): Defendant Recruited an Individual to Cash Mortgage Fraud Checks*

48.  CW8 cashed checks from accounts that received funds in a mortgage fraud scheme, including at one of the defendant's stores. The underlying mortgage fraud involved submitting a straw buyer for a property and using a fake title company to receive the funds. In the scheme, the property never was transferred. The scheme netted approximately $3.7 million in fraud proceeds

49.  CW8 advised that he/she has known the defendant since 2002. In the summer of 2015, the defendant met CW8 at a store in Hialeah. The defendant asked CW8 to cash checks payable to CW8 for a 3% fee if cashed at a check-cashing store or a 4% fee if deposited into CW8's

bank account. These checks all came from the bank accounts that received fraudulent funds in the mortgage fraud scheme.

50.     In July and August 2015, CW8 cashed approximately $250,000 in checks from the mortgage fraud scheme made payable to CW8 or CW8's companies. CW8 explained that all of these checks came from the defendant. On or about July 21, 2015, CW8 cashed a $44,000 check from the mortgage fraud scheme received from the defendant at Doger Group. CW8 said the defendant directed CW8 to go to Doger Group.

### The Defendant Instructed Witnesses to Lie Before the Grand Jury

51.     The United States issued grand jury subpoenas to several of the defendant's tellers. These tellers, including Confidential Witness 9 ("CW9"), testified before the grand jury in January 2015. In their testimony, the tellers generally denied the defendant's involvement in the check-cashing stores of Minimalist, Don Koky and Doger.

52.     In mid-2017, CW9 met with law enforcement regarding his/her testimony. CW9 acknowledged that he/she had not accurately described defendant's involvement during her grand jury testimony. CW9 explained that, prior to his/her grand jury testimony, the defendant set up a meeting with the defendant, the tellers, and the defendant's attorney at a restaurant in Miami. CW9 said that the defendant told the tellers that they could not testify that the defendant ran the stores. CW9 said that the defendant would make all of it go away. CW9 explained that he/she had recently emigrated from Cuba and feared losing his/her job if he/she did not testify as defendant requested.

53.     CW9 explained that he/she cashed large pharmacy checks at an approximately 10% fee at the direction of Suarez. CW9 further recalled cashing large tax refund checks for CW5 for

for an additional fee. CW9 also admitted that he/she had a prepaid phone at the store that the tellers would use to communicate with the defendant for authorization on cashing checks.

## CONCLUSION

54. Based on the foregoing, I respectfully submit that there is probable cause to believe that, from 2013 to 2015, the defendant has engaged in (i) conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); (ii) theft of government money, in violation of Title 18, United States Code, Section 641; (iii) bribery of a bank official in violation of Title 18, United States Code, Section 215; and (iv) obstruction of justice, in violation of Title 18, United States Code, Section 1512.

_____
Timothy Lawler
Special Agent
FBI Criminal Investigation

Subscribed and sworn to before me
On June 21, 2018.

_____
EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE