1                     UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
2
                        18-20669-CR-SCOLA-TORRES
3

4
UNITED STATES OF AMERICA,        )
5                                )
                PLAINTIFF,       )
6                                )
          VS.                    )
7                                )
EVELIO SUAREZ,                   )
8                                )
                DEFENDANT.       )
9   _____)

10                (TRANSCRIPT BY DIGITAL RECORDING)

11

12           TRANSCRIPT OF PRETRIAL DETENTION HEARING HAD BEFORE

13  THE HONORABLE CHRIS M. MCALILEY, IN MIAMI, MIAMI-DADE COUNTY,

14  FLORIDA, ON JULY 2, 2018, IN THE ABOVE-STYLED MATTER.

15

16
APPEARANCES:
17
FOR THE GOVERNMENT:  MICHAEL N. BERGER, A.U.S.A.
18                   99 NE 4TH STREET
                     MIAMI, FL 33132 - 305 961-9445
19
FOR THE DEFENDANT:   GUSTAVO J. GARCIA-MONTES, ESQ.
20                   2333 BRICKELL AVENUE, SUITE A-1
                     MIAMI, FL 33129 - 305 666-2880
21

22

23                  CARL SCHANZLEH, RPR - CM
                    CERTIFIED COURT REPORTER
24                   9960 SW 4TH STREET
                   PLANTATION, FLORIDA 33324
25                     954 424-6723

TABLE OF CONTENTS

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TIMOTHY LAWLER ............................. 19 | | 25 | | |

INDEX TO EXHIBITS

| EXHIBITS | MARKED FOR IDENTIFICATION | | RECEIVED IN EVIDENCE | |
|---|---|---|---|---|
| DESCRIPTION | PAGE | LINE | PAGE | LINE |

1  (MIAMI, MIAMI-DADE COUNTY, FLORIDA;  JULY 2, 2018, IN OPEN

2  COURT.)

3          THE COURT:  OKAY.  EVELIO SUAREZ, 18-2965.

4          GO AHEAD AND ENTER YOUR APPEARANCES.

5          MR. BERGER:  GOOD MORNING, YOUR HONOR.  MICHAEL BERGER

6  APPEARING ON BEHALF OF THE UNITED STATES.

7          MR. GARCIA-MONTES:  GOOD MORNING, YOUR HONOR.  GUSTAVO

8  GARCIA-MONTES ON BEHALF OF MR. EVELIO SUAREZ.

9          THE COURT:  YOU HAVE TO SAY IT A LITTLE MORE SLOWLY.

10          MR. GARCIA-MONTES:  I'M SORRY.  GUSTAVO GARCIA-MONTES

11  ON BEHALF OF MR. EVELIO SUAREZ WHO IS PRESENT THROUGH THE USE

12  -- THROUGH THE HELP OF AN INTERPRETER.

13          THE COURT:  OKAY.

14          AND THEN ON WHAT GROUNDS IS THE GOVERNMENT ASKING TO

15  HAVE MR. SUAREZ DETAINED?

16          MR. BERGER:  RISK OF FLIGHT.

17          THE COURT:  OKAY.  IS THERE A STATUTORY PRESUMPTION?

18          MR. BERGER:  NO, YOUR HONOR.

19          THE COURT:  OKAY.

20          ALL RIGHT.  SO, MR. BERGER, IF YOU LIKE YOU CAN

21  PROFFER THE DIRECT TESTIMONY OF YOUR WITNESS.

22          MR. BERGER:  YES, YOUR HONOR.

23          THE GOVERNMENT IS -- AND I'M GOING TO START WITH THE

24  EVIDENCE IN THIS MATTER, AND THE EVIDENCE WILL SHOW THAT THE

25  DEFENDANT --

```
 1              A VOICE:  SORRY, HE CAN'T HEAR.

 2              THE COURT:  OKAY.

 3              THE INTERPRETER:  WE'LL GET HIM ANOTHER ONE, YOUR

 4   HONOR.

 5              THE COURT:  YEAH.  NO PROBLEM.

 6              YEAH.  AND YOUR PROFFER IS JUST WHAT YOUR WITNESS'

 7   TESTIMONY IS, EVIDENCE, RIGHT?

 8              I MEAN, YOU CAN ARGUE THE REPORT LATER.

 9              MR. BERGER:  THE EVIDENCE WILL SHOW THAT THE DEFENDANT

10   RAN A MASSIVE MONEY LAUNDERING OPERATION THROUGH THREE CHECK

11   CASHING STORES THAT WERE CONTROLLED THROUGH NOMINEES.

12              DURING THE PERIOD THAT'S RAISED IN THE COMPLAINT, FROM

13   2013 THROUGH 2014 THESE THREE CHECK CASHING STORES CASHED

14   NEARLY 5OO MILLION DOLLARS WORTH OF CHECKS.

15              THE COURT:  FIVE HUNDRED MILLION?

16              MR. BERGER:  FIVE HUNDRED MILLION.

17              THE COURT:  GOT IT.

18              MR. BERGER:  A MAJORITY OF WHICH APPEARED TO COME FROM

19   FRAUDULENT ACTIVITY, INCLUDING HEALTH CARE FRAUD, TAX REFUND

20   FRAUD -- IDENTITY THEFT CASH REFUND FRAUD, MORTGAGE FRAUD,

21   WORKER'S COMPENSATION FRAUD AND OTHER FRAUDULENT ACTIVITY.

22              THE DEFENDANT CONTROLLED THESE STORES THROUGH THE

23   NOMINEES, AND THE GOVERNMENT WILL PROVE -- THE WAY THAT THE

24   GOVERNMENT WILL SHOW THAT IS FIRST OF ALL, ALL THREE OF THESE

25   STORES HAVE THE SAME CHARACTERISTICS, WHICH IS FIRST EACH OF
```

1  THEM CASHED INDIVIDUAL CHECKS THAT EXCEEDED $150,000.

2      THERE WERE TAX REFUND CHECKS, INDIVIDUAL TAX REFUND

3  CHECKS THAT WERE OVER A $250,000, INDIVIDUAL HEALTH CARE FRAUD

4  CHECKS DIRECTLY FROM MEDICARE SOME AS LARGE AS 3OO AND

5  $400,000.

6      THESE THREE STORES CASHED CHECKS THAT WERE PAYABLE TO

7  THE SAME PAYEES.  SO, FOR EXAMPLE, EIGHTH STREET PHARMACY

8  CASHED CHECKS EXCEEDING A HUNDRED THOUSAND DOLLARS AT ALL THREE

9  STORES AND EACH OF THEM BANKED AT THE SAME BANK IN PEMBROKE

10  PINES.

11      THE COURT:  YOU MEAN THE CHECK CASHING STORES?

12      MR. BERGER:  ALL THREE CHECK CASHING STORES JUST TO

13  SHOW YOU THAT THERE IS A GENERAL SIMILARITY BETWEEN THE TYPES

14  OF ACTIVITY THAT WAS GOING ON IN THE STORE.  BUT IT'S NOT JUST

15  THE TYPES OF ACTIVITY, THE GOVERNMENT HAS NUMEROUS CONFIDENTIAL

16  WITNESSES THAT WILL CONFIRM THAT THE DEFENDANT CONTROLLED THE

17  ACTIVITY IN THE STORES.

18      FIRST THERE IS ONE OF THE NOMINEE OWNERS -- AND I

19  WOULD JUST POINT OUT THAT AT THE TIME OF THE ACTIVITY THE

20  DEFENDANT WAS ON STATE PROBATION FOR MONEY LAUNDERING AND

21  WORKER'S COMPENSATION FRAUD.  AND SO THAT AND HIS PRIOR FEDERAL

22  CONVICTION PREVENTED HIM FROM OWNING A STORE IN HIS OWN NAME.

23      THE COURT:  SO IN THIS 2013, 2014 PERIOD.

24      MR. BERGER:  HE WAS ON PROBATION --

25      THE COURT:  RIGHT.

1        MR. BERGER:  -- WITH THE STATE FOR MONEY LAUNDERING --

2        THE COURT:  RIGHT.

3        MR. BERGER:  -- AND WORKER'S COMPENSATION FRAUD.

4        THE COURT:  OKAY.

5        MR. BERGER:  THE FIRST NOMINEE OWNER WILL TESTIFY --

6   WOULD TESTIFY THAT SHE USED TO PAY THE DEFENDANT 5O PERCENT OF

7   THE NORMAL PROCEEDS FROM THE STORE.

8        AND I'M GOING TO DISTINGUISH HERE BECAUSE THE

9   STORES -- THE CHECK CASHING STORE MAKES IT TYPICAL MONEY BY

10  CHARGING A FEE OF SOMEWHERE BETWEEN ONE AND TWO PERCENT.

11  SEPARATELY I'M GOING TO GET INTO ALL THE OTHER WITNESSES WHO

12  WILL SHOW THAT THE DEFENDANT WAS TAKING AN EXTRA PERCENTAGE

13  BECAUSE HE KNEW THE CHECKS WERE FRAUDULENT.  I JUST FIRST WANT

14  TO ESTABLISH THE WITNESSES THAT SHOW THAT HE WAS CONTROLLING

15  THESE STORES.

16        THE COURT:  OKAY.

17        MR. BERGER:  SO NOMINEE NUMBER ONE WOULD TESTIFY THAT

18  SHE USED PAID THE DEFENDANT FIFTY PERCENT OF THE PROCEEDS --

19        THE COURT:  FIVE OH?

20        MR. BERGER:  OF THE STORE.  YEAH, HALF OF THE PROCEEDS

21  OF THE STORE, WHICH WERE THE ONE TO TWO PERCENT FEES THAT WERE

22  COMING IN.

23        THE COURT:  AH-HUH.

24        MR. BERGER:  THE GOVERNMENT HAS OBTAINED EVIDENCE OF

25  CHECKS FROM HER STORE PAYABLE TO A COMPANY IN THE DEFENDANT'S

 1 NAME.  SO IT WAS IN APRIL OF 2014 THERE WERE CHECKS THAT WERE

 2 MADE PAYABLE TO THE DEFENDANT'S CORPORATION FOR CONSULTING FEES

 3 THAT ADDED UP TO ABOUT $13,000 FOR THAT MONTH.

 4         THE COURT:  SO WAIT A MINUTE.

 5         THERE IS EVIDENCE OF CHECKS FROM THIS PARTICULAR

 6 NOMINEE STORE PAYABLE TO A COMPANY IN THE DEFENDANT'S NAME THAT

 7 IS CONSULTING FEES FOR HELPING THE CHECK CASHING STORE IS THE

 8 IDEA?

 9         MR. BERGER:  YES.  IT WAS ESSENTIALLY THE DEFENDANT

10 WAS RESPONSIBLE FOR BRINGING ALL OF THE BUSINESSES -- ALL THE

11 BUSINESS TO THE STORE BECAUSE HE HAD THE CONNECTIONS IN THE

12 COMMUNITY WITH VARIOUS FRAUDSTERS --

13         THE COURT:  RIGHT.

14         MR. BERGER:  -- FOR LACK OF A BETTER WORD.

15         THE COURT:  RIGHT.  RIGHT.

16         MR. BERGER:  SO THE STORE WOULD CHARGE A NOMINAL ONE

17 TO TWO PERCENT AND THE DEFENDANT WAS TAKING HALF OF THAT STORE

18 FEE.

19         THE COURT:  OKAY.

20         MR. BERGER:  AND THIS WITNESS WOULD TESTIFY THAT SHE

21 PAID THE DEFENDANT FOR THIS, AND THIS WAS JUST ONE MONTH A

22 $13,000 CHECK.  IT HAS THE DEFENDANT'S -- WHAT APPEARS TO BE

23 THE DEFENDANT'S SIGNATURE ON THE BACK.  AND SHE SAID THAT THE

24 DEFENDANT WOULD COMPLAIN BECAUSE THE OTHER CHECK CASHING STORES

25 USED TO PAY HIM IN CASH WHICH HE PREFERRED.

1           THE COURT:  WHEN YOU SAY THESE ARE NOMINEES, MY

2   ASSUMPTION IS THAT YOU MEAN THAT THE DEFENDANT CREATE -- SET UP

3   THE STORE AND PAID SOMEONE TO PUT THEIR NAME ON THE PAPERWORK.

4           BUT MAYBE WHAT YOU'RE STANDING, NOT SOUNDING

5   DIFFERENT, BUT MAYBE HE KNOWS THESE PEOPLE WHO HAVE CHECK

6   CASHING STORES AND THEN ENTERED INTO A RELATIONSHIP WITH THEM

7   TO BRING THEM ALL THIS BUSINESS AND GET A LARGE CUT.  ARE YOU

8   SAYING THE LATTER?

9           MR. BERGER:  IT'S MORE THE LATTER.

10          ONE OF THE STORES ONCE HE WAS ARRESTED IN 2012 WAS

11  THEN TAKEN OVER BY SOMEBODY ELSE.  SO THIS WAS A LOCATION THAT

12  HE USED TO CONTROL IN VARIOUS WAYS.  SO -- BUT THEY'RE

13  ESSENTIALLY PEOPLE WHO HAVE A CHECK CASHING LICENSE WHO CASHED

14  THE CHECKS WHO THEN CUT HIM IN ON THE -- AND HE BRINGS THE

15  VOLUME AND THEY CUT HIM IN ON THE --

16          THE COURT:  OKAY.

17          MR. BERGER:  -- PERCENTAGE.

18          AND WHAT IS CRITICAL TO THIS CASE IS THAT THE TELLERS

19  WHO WORKED AT THE STORES WERE EXCEEDINGLY LOYAL.  THEY REMAINED

20  IN THE SAME TELLERS THAT HAD PREVIOUSLY WORKED FOR THE

21  DEFENDANT BEFORE HE WAS CHARGED AT THE STATE.

22          AND AS MULTIPLE WITNESSES WILL TESTIFY, INCLUDING ONE

23  IN PARTICULAR, THE DEFENDANT USED TO MAINTAIN APPROXIMATELY 14

24  TO 15 PREPAID CELLPHONES THAT HE WOULD USE TO COMMUNICATE

25  EITHER WITH THE TELLERS AT THE STORE -- SOME OF THE DIFFERENT

1  STORES OR WITH VARIOUS DIFFERENT FRAUDSTERS OUT IN THE

2  COMMUNITY.

3          THE COURT:  YOU HAVE A WITNESS WHO WILL TESTIFY TO

4  THAT.

5          MR. BERGER:  YES.

6          THE COURT:  AH-HUH.

7          MR. BERGER:  AND MANY OF THESE WITNESSES HAVE ALREADY

8  TESTIFIED BEFORE THE GRAND JURY.  SO I'M -- I'M TALKING ABOUT

9  TESTIMONY THAT'S NOT JUST HYPOTHETICAL BUT --

10          THE COURT:  RIGHT.

11          MR. BERGER:  -- ACTUAL TESTIMONY THAT WE WOULD PRESENT

12  AT TRIAL.

13          THE COURT:  OKAY.

14          MR. BERGER:  OKAY?

15          WE HAVE -- SO THAT'S NOMINEE NUMBER -- THE NOMINEE OF

16  THE CHECK CASHING STORE.

17          BUT MORE THAN THAT WE HAVE A COMPLIANCE OFFICER FROM

18  THE BANK THAT BANKED THESE THREE CHECK CASHING STORES WHICH WAS

19  CALLED PEOPLES CREDIT UNION.

20          THIS WITNESS HAS PLED GUILTY FOR ACCEPTING BRIBES FROM

21  THE DEFENDANT, SHE'S ALREADY BEEN SENTENCED.  SHE WOULD TESTIFY

22  THAT THE DEFENDANT WAS PAYING HER $400 PER WEEK FOR TWO THINGS.

23  FIRST THE DEFENDANT WANTED THE BANK STATEMENTS FROM THE

24  DIFFERENT CHECK CASHING STORES TO MAKE SURE THAT THE CHECK

25  CASHING STORES WEREN'T SHORTING HIM.  SO IN OTHER WORDS HE

1 WANTED TO MAKE SURE THAT HIS CUT FROM THE CHECK CASHING STORES

2 WASN'T INFRINGED UPON.

3 SECONDLY, THE CHECK CASHING STORES WERE CASHING SUCH A

4 LARGE VOLUME OF CHECKS -- I MEAN SOMETIMES IT WAS LIKE A

5 MILLION DOLLARS A WEEK, THE BANK WAS FRONTING CASH, LARGE

6 VOLUMES OF CASH TO THE CHECK CASHING STORE OFF BOOKS, AND SO

7 THE DEFENDANT WAS PAYING FOR THAT BASICALLY FREE LOANS THAT

8 THEY WOULD THEN MAKE UP ON A FRIDAY WITH ENORMOUS VOLUMES OF

9 CHECKS.

10 THE COURT:  AH-HUH.

11 MR. BERGER:  SO THAT'S THE OTHER PIECE OF EVIDENCE OF

12 THE DEFENDANT'S CONTROL OF THE THREE STORES, BOTH ONE OF THE

13 NOMINEES, THE BANK COMPLIANCE OFFICER.  AND ACTUALLY THERE IS A

14 SECOND NOMINEE WHO CONTROLLED THE STORE FOR A SHORT PERIOD WHO

15 WOULD CONFIRM THAT THE DEFENDANT ALSO CONTROLLED THESE THREE

16 STORES, AND THAT HE ACTUALLY LEFT BECAUSE THE DEFENDANT WAS

17 CASHING -- WAS TOLD NOT TO CASH TAX REFUND CHECKS AND HE WAS

18 CASHING LIKE $50,000 TAX REFUND -- LARGE CHECKS.  SO THAT'S THE

19 EVIDENCE THAT HE CONTROLS THE STORE.

20 SO WHAT'S THE EVIDENCE THAT HE KNEW THAT THIS -- THAT

21 THE CHECKS CAME FROM FRAUDULENT ACTIVITY WHICH IS SORT OF THE

22 HEART OF THE GOVERNMENT'S CASE.

23 FIRST AND MOST IMPORTANTLY WE HAVE TWO SEPARATE

24 CONFIDENTIAL WITNESSES, ONE OF WHOM HAS PLED GUILTY THAT THE

25 DEFENDANT KNOWINGLY CASHED FRAUDULENT TAX REFUND CHECKS.

1           BOTH WITNESSES WILL CONFIRM THAT THEY MET WITH THE

2   DEFENDANT IN 2013 AT ONE OF THE CHECK CASHING STORES, THAT THEY

3   SHOWED HIM $150,000 TAX REFUND CHECKS, EACH WAS INDIVIDUALLY IN

4   THE AMOUNT OF $150,000 THAT WERE OBTAINED FROM THE FILING OF

5   TAX RETURNS USING STOLEN IDENTIFICATION DOCUMENTS.

6           THE COURT:  AH-HUH.

7           WHO WERE THEY MADE OUT TO, THESE CHECKS?

8           MR. BERGER:  MADE OUT TO INDIVIDUALS.  MADE OUT TO

9   PEOPLE WHOSE IDENTITIES HAD BEEN STOLEN.

10          THE COURT:  SO THEN WHEN IT GETS PRESENTED TO THE

11   STORE DOES SOMEBODY WHO IS PRESENTING TO THE STORE GIVE A FAKE

12   ID TO MATCH THE NAME OF THE PAYEE OR IS THE STORE --

13          MR. BERGER:  THIS IN THIS CASE THAT'S THE WHOLE REASON

14   WHY THESE STORES WERE OVERFLOWING WITH FRAUDULENT CHECKS WAS

15   THAT THESE STORES DID NOT REQUIRE A PERSON TO BE PRESENT AND

16   PRESENT A REAL ID.

17          SO IN THIS CASE THESE CHECKS WERE JUST PRESENTED TO

18   THE DEFENDANT, THERE WERE FRAUDULENT ID'S PROVIDED AND THE

19   DEFENDANT CHARGED A 30 PERCENT FEE FOR CASHING THOSE CHECKS

20   BECAUSE HE KNEW THEY CAME FROM FRAUDULENT ACTIVITY.

21          SOME OF THOSE -- ACTUALLY -- I'M SORRY -- THAT ARE

22   LAID OUT IN THE COMPLAINT THAT WE FILED IN THIS MATTER BUT

23   THERE WERE AT LEAST FIVE OF THESE CASHED AT ONE OF THE STORES,

24   AND ONE OF THEM WAS CASHED AT A SECOND STORE WHICH ALSO

25   CORROBORATES IN FACT THAT HE DID CONTROL BOTH -- THAT THE

1  DEFENDANT DID CONTROL THOSE STORES.  THOSE TWO WITNESSES WILL

2  CONFIRM THOSE EIGHT CHECKS -- OR SEVEN OR EIGHT CHECKS.

3      THERE IS A THIRD WITNESS WHO CONFIRMS THAT HE ALSO

4  CASHED FRAUDULENT TAX REFUND CHECKS WITH THE DEFENDANT, THAT

5  THE DEFENDANT DID NOT REQUIRE REAL IDENTIFICATION DOCUMENTS AND

6  THAT HE WOULD MAKE FAKE IDENTIFICATION DOCUMENTS AS NECESSARY.

7      NOW AS FAR AS HEALTH CARE FRAUD CHECKS.  WE HAVE TWO

8  SEPARATE CONFIDENTIAL WITNESSES WHO CONFIRM THAT THE DEFENDANT

9  CASHED FRAUDULENT HEALTH CARE CHECKS, AND THEY'RE OUTLINED IN

10  THE COMPLAINT THE DETAILS ON THAT.  BUT WE'VE DONE SOME BACK OF

11  THE ENVELOPE ANALYSIS.  MOST OF THESE THAT WERE CASHED IN 2014

12  IS WHEN THE HEALTH CARE FRAUD MORPHED INTO PHARMACIES.

13      SO THIS PARTICULAR CONFIDENTIAL WITNESS SAID THAT HE

14  KNEW THE DEFENDANT, THAT HE WASN'T MAKING -- THAT INITIALLY HE

15  WAS BRINGING CHECKS FROM CONSTRUCTION COMPANIES.

16      AND A LOT OF THIS VOLUME -- AND I'M NOT GOING TO GET

17  MUCH INTO THIS CONSTRUCTION COMPANY CHECKS.  BUT A LOT OF WHAT

18  HAPPENS IS UNDOCUMENTED WORKERS ARE PAID VIA CHECKS.  AND SO

19  WHAT A LOT OF GENERAL CONTRACTORS DO DOWN HERE IN MIAMI IS THEY

20  HIRE A SHELL COMPANY WHO THEN HIRES THE UNDOCUMENTED WORKERS.

21      THE SHELL COMPANY BRINGS ITS CHECKS TO THE CHECK

22  CASHING STORE OFTEN -- AND THAT SHELL COMPANY DOESN'T HAVE

23  SUFFICIENT WORKER'S COMP, AND SO THEY THEN PAY THE WORKERS IN

24  CASH FROM THOSE CONSTRUCTION CITES.

25      BUT WHAT HE SAID WAS HE USED TO CASH CONSTRUCTION

1   COMPANY CHECKS AND THEN AT SOME POINT HE ASKED THE DEFENDANT

2   ABOUT CASHING HEALTH CARE CHECKS AND THEY AGREED ON AN EXTRA

3   SPLIT OF TEN PERCENT.  SO THE STORE WOULD GET ONE OR TWO

4   PERCENT AND THE DEFENDANT AND THIS WITNESS WOULD GET SIX

5   PERCENT.

6            AND THIS WITNESS HAS ALREADY PLED GUILTY TO MONEY

7   LAUNDERING AND HE IDENTIFIED A NUMBER OF DIFFERENT PHARMACIES

8   FOR WHICH HE BROUGHT IN CHECKS, LATEN QUARTER PHARMACY, SUNVIEW

9   PHARMACY.

10           AND WHEN WE WENT THROUGH THE RECORDS FROM THE CHECK

11  CASHING STORES THERE WERE NUMEROUS INDIVIDUAL CHECKS VALUED AT

12  $50,000 OR HIGHER THAT WERE CASHED AT THE DEFENDANT'S STORE.

13           SO, FOR EXAMPLE, THERE WERE 55 CHECKS FOR SUNVIEW

14  PHARMACY FOR ONE AND A HALF MILLION.  AT ONE STORE THERE WAS

15  ANOTHER 36 CHECKS FOR 1.1 MILLION AT ANOTHER STORE.  AND THE

16  SAME WITNESS SAID THAT HE BROUGHT FRAUDULENT TAX REFUND CHECKS

17  AND THAT THE DEFENDANT WOULD MAKE FAKE ID'S FOR THOSE CHECKS.

18           IN ADDITION TO THOSE HEALTH CARE FRAUD CHECK WITNESSES

19  WE ALSO HAVE A WITNESS WHO SAID THAT HE USED TO BRING IN

20  MORTGAGE FRAUD CHECKS TO THIS DEFENDANT.  AND WE'VE IDENTIFIED

21  A NUMBER OF THOSE CHECKS IN THE COMPLAINT INCLUDING THERE IS A

22  SERIES OF THEM -- THE LARGEST ONE WAS A $377,000 CHECK THAT WAS

23  CASHED AT THE DEFENDANT'S STORE --

24           THE COURT:  HOW MUCH?

25           MR. BERGER:  THREE HUNDRED SEVENTY-SEVEN THOUSAND.

 1            THIS WITNESS SAID THAT THE DEFENDANT WOULD CHARGE --

 2   THAT THE CHARGES WOULD VARY BUT THAT THESE CHECKS WERE ALL MADE

 3   OUT TO PEOPLE WHO WERE NOT PRESENT OR TO BASICALLY GHOSTS.

 4   EITHER PEOPLE WHO FLED THE CUBA, PEOPLE WHOSE IDENTITIES HAD

 5   BEEN STOLEN.

 6            IN THIS WAY THE REASON THAT THE DEFENDANT -- OR THAT

 7   THESE WITNESSES ARE COMING TO THIS STORE IS BECAUSE THEY CAN

 8   HIDE AND DISGUISE THEIR INVOLVEMENT IN THIS FRAUD.  SO IF THEY

 9   BRING A TAX REFUND CHECK IN SOMEBODY ELSE'S NAME AND CASH IT

10   HERE WILL NEVER SEE IT.  IF THEY BRING A MORTGAGE FRAUD

11   CHECK --

12            THE COURT:  YOU WON'T SEE THAT PERSON'S --

13            MR. BERGER:  YOU WON'T SEE THAT PERSON'S --

14            (BOTH TALKING AT THE SAME TIME)

15            THE COURT:  -- FINGERPRINTS ON IT SO TO SPEAK.

16            MR. BERGER:  CORRECT.

17            AND IN TYPICALLY THE HEALTH CARE FRAUD CHECKS, THE

18   NOMINEES -- WHEN THE NOMINEES OF THE HEALTH CARE HEALTH AGENCY

19   OR PHARMACY HAS BEEN PAID TO FLEE TO CUBA.  AND SO, THEN THE

20   CHECKS WERE MADE OUT TO THAT PERSON.  AND THEN WHEN LAW

21   ENFORCEMENT COMES LATER WERE JUST CHASING A GHOST OF THE PERSON

22   WHO HAS ALREADY FLED TO CUBA.  BUT THE BOTTOM LINE FOR --

23            THE COURT:  AND THE MONEY HASN'T GONE TO THAT PERSON

24   ANYWAY.

25            MR. BERGER:  RIGHT.  IT'S GOING TO THE SCAMMER WHO'S

1   BROUGHT THE CHECKS TO THE DEFENDANT.

2          THE COURT:  RIGHT.

3          MR. BERGER:  SO THE BOTTOM LINE IS THAT --

4          THE COURT:  CAN YOU -- HOW MUCH HAVE YOU DOCUMENTED

5   GOTTEN TO MR. SUAREZ'S POCKET?

6          MR. BERGER:  RIGHT.  SO THAT'S EXACTLY WHERE I WAS

7   GOING TO GO NEXT.  SO WHAT WE HAVE BEEN ABLE TO DO IS A COUPLE

8   OF THINGS.

9          FIRST, WHAT'S TRICKY IN THIS CASE IS YOU'RE LOOKING

10  HERE, AND I LOOK AT THE DEFENDANT'S PRETRIAL SERVICES REPORT

11  AND THERE IS BASICALLY NOTHING LISTED BECAUSE NOTHING IS KEPT

12  IN THE DEFENDANT'S NAME AS YOU WOULD IMAGINE IN A CASE LIKE

13  THIS.

14         BUT ONE OF THE THINGS THAT WAS INTERESTING WE WERE

15  TOLD BY WITNESSES THAT THE DEFENDANT LIKED LOUI VUITTON.  AND

16  SO WE SUBPOENAED LOUI VUITTON, AND EVEN THOUGH THERE IS NO JOB

17  OR ANYTHING LISTED FROM 2013 TO THE PRESENT THE DEFENDANT HAS

18  SPENT $150,000 AT LOUI VUITTON.

19         WE ALSO TRACED THREE DIFFERENT PURCHASES OF REAL

20  ESTATE TO A COMPANY CALLED EAST COAST PROPERTY ACQUISITION

21  THAT'S LOCATED -- WELL, THE COMPANY IS A FLORIDA CORPORATION

22  BUT IT PURCHASED AT LEAST -- AND WE HAVE MORE, BUT WHAT WE'VE

23  BEEN DIRECTLY ABLE TO TRACE IS THREE DIFFERENT HALF MILLION

24  DOLLAR HOMES IN MIRAMAR THAT WAS PURCHASED THROUGH CASHIERS

25  CHECKS THAT WERE WRITTEN OUT OF THE -- OUT OF THE CHECK CASHING

 1  STORES ACCOUNTS THAT FUNDED THE DOWN PAYMENT FOR THESE

 2  PROPERTIES.

 3          I WOULD ALSO NOTE -- AND IT'S NOT LISTED IN THE

 4  PRETRIAL SERVICES REPORT -- BUT AT THE TIME OF HIS ARREST --

 5          THE COURT:  AND I GATHER THOSE PROPERTIES ARE NOT IN

 6  MR. SUAREZ'S NAME.

 7          MR. BERGER:  OF COURSE NOT.

 8          AND I WOULD ALSO NOTE THAT AT THE TIME OF HIS ARREST

 9  HE WAS DRIVING A LAND ROVER, AND YOU DON'T -- THERE IS NO LAND

10  ROVER LISTED HERE ON THE PRETRIAL SERVICES REPORT --

11          THE COURT:  RIGHT.

12          AND WHO IS THAT LAND ROVER REGISTERED TO --

13          MR. BERGER:  I BELIEVE IT'S

14          THE COURT:  -- SOMEBODY ELSE?

15          MR. BERGER:  -- REGISTERED IN IT'S REGISTERED IN THE

16  DAUGHTER'S NAME.

17          THE COURT:  OKAY.

18          DO YOU HAVE A SENSE OF THE VALUE OF THAT CAR?  LIKE IS

19  IT A RECENT --

20          MR. BERGER:  I DON'T KNOW WHETHER IT'S OWNED OR

21  LEASED, BUT I WOULD JUST NOTE -- I JUST WAS NOTICING THAT AS I

22  WAS GOING THROUGH THE PRETRIAL SERVICES REPORT.

23          THE COURT:  OKAY.

24          MR. BERGER:  OBVIOUSLY IT'S VERY DIFFICULT IN THESE

25  TYPES OF CASES TO TRACE PARTICULARLY HERE BECAUSE IT'S CASH --

1           THE COURT:  RIGHT.

2           MR. BERGER:  -- PROCESS WHICH MAKES IT EXTRAORDINARILY

3  DIFFICULT --

4           THE COURT:  RIGHT.

5           MR. BERGER:  -- TO FOLLOW THE MONEY.

6           THEN MOST IMPORTANTLY I THINK AS WELL FOR DETENTION

7  PURPOSES, NOT ONLY THE FACT THAT THERE IS -- IS THE OBSTRUCTION

8  OF JUSTICE WHICH WE LAY OUT AT THE BOTTOM OF THE COMPLAINT.

9           IN THIS CASE WE --

10          THE COURT:  I HAVEN'T READ THE COMPLAINT.

11          MR. BERGER:  OH.  I'M SORRY.

12          BUT ESSENTIALLY WE -- THE GOVERNMENT SUBPOENAED A

13 NUMBER OF THE TELLERS THAT WORKED AT THE DEFENDANT'S STORE TO

14 TESTIFY BEFORE THE GRAND JURY.  MANY OF THEM TESTIFIED IN FACT

15 THAT THE DEFENDANT HAD NO INVOLVEMENT.

16          THE COURT:  OKAY.

17          MR. BERGER:  WE BROUGHT IN ONE OF THE TELLERS LATER

18 AFTER SPEAKING WITH HER PARENTS AND SHE ADMITTED THAT THE

19 DEFENDANT HAD A MEETING BEFORE HER TESTIMONY WITH THE TELLERS

20 AND AT LEAST ONE OF THE NOMINEE OWNERS AND INSTRUCTED THE

21 TELLERS TO TESTIFY BEFORE THE GRAND JURY THAT HE HAD NO

22 INVOLVEMENT IN THE STORE.

23          THE COURT:  OKAY.

24          MR. BERGER:  HE TOLD THEM EVERYTHING WOULD BE ALL

25 RIGHT, NOT TO WORRY.

1       SHE CAME FORWARD LATER AND SHE TOLD US THAT SHE IS A

2   RECENT IMMIGRANT FROM CUBA, THIS WAS HER FIRST JOB, SHE WAS

3   SCARED BUT SHE ADMITTED THAT THE DEFENDANT -- AND THE DEFENDANT

4   WAS THE FIRST ONE WHO HIRED HER BUT THAT THE DEFENDANT USED A

5   PREPAID PHONE TO COMMUNICATE WITH HER.  THAT HE WOULD CASH THE

6   HEALTH CARE FRAUD CHECKS FOR 1O PERCENT, AND THAT SHE ALSO

7   CORROBORATED THAT THE TAX REFUND -- THOSE LARGE TAX REFUND

8   CHECKS, THE TWO INDIVIDUALS WHO HAD BROUGHT IN THE LARGE TAX

9   REFUND CHECKS.

10      SHE FURTHER TESTIFIED THAT IT WAS ALMOST LIKE A CASINO

11  WHERE THE TELLERS WOULD GET LARGE TIPS AFTER CASHING THESE BIG

12  CHECKS, LIKE SOMETIMES AS LARGE AS $1,OOO AFTER CASHING THESE

13  MASSIVE CHECKS.  BUT SHE SAID BASICALLY THAT SHE HAD BEEN

14  INSTRUCTED TO TESTIFY FALSELY BEFORE THE GRAND JURY BASED THE

15  DEFENDANT'S INSTRUCTIONS.

16      THE COURT:  OKAY.  IS THAT YOUR PROFFER?

17      MR. BERGER:  THAT'S THE END OF THE PROFFER.

18      THE COURT:  OKAY.

19      IS THERE ANY CROSS-EXAMINATION?

20      MR. GARCIA-MONTES:  YES, YOUR HONOR.

21      THE COURT:  LET'S BRING YOUR WITNESS UP.

22      MR. BERGER:  YES.  TIMOTHY LAWLER FROM THE FBI.

23      (WITNESS SWORN)

24      THE WITNESS:  I DO.

25      THE CLERK:  PLEASE HAVE A SEAT AND STATE YOUR NAME FOR

1    THE RECORD AND SPELL YOUR NAME.

2         THE WITNESS:  TIMOTHY LAWLER, T-I-M-O-T-H-Y

3    L-A-W-L-E-R.

4         THE COURT:  L-A-W-L-E-R?

5         THE WITNESS:  YES, MA'AM.

6         THE COURT:  OKAY.  BE SURE TO SPEAK INTO THAT

7    MICROPHONE.

8         OKAY.

9                   TIMOTHY LAWLER,

10   BEING DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

11                 CROSS EXAMINATION

12   BY MR. GARCIA-MONTES:

13   Q.  GOOD MORNING, AGENT.

14   A.  GOOD MORNING.

15   Q.  SIR, I HAVE SOME QUESTIONS.  YOU DRAFTED THE -- YOU SIGNED

16   THE AFFIDAVIT, CORRECT?

17   A.  YES.

18   Q.  OKAY.  NOW, IS IT CORRECT THAT AS OF DECEMBER 5TH, 2012,

19   MR. SUAREZ WAS WORKING AS AN INFORMANT FOR A TASK FORCE IN

20   MIAMI-DADE COUNTY?

21   A.  I DIDN'T KNOW.  I DO NOT RECALL.

22   Q.  IS IT CORRECT THAT MR. SUAREZ --

23   A.  EXCUSE ME.  I BELIEVE HE WAS, YES.

24   Q.  OKAY.

25         THE COURT:  THIS IS IN 2012 YOU SAID?

1          THE WITNESS:  YES.

2   BY MR. GARCIA-MONTES:

3   Q.   AND HE WORKED AS AN INFORMANT BOTH FOR A TASK FORCE IN

4   MIAMI-DADE COUNTY ALL THROUGH UNTIL 2014, CORRECT?

5   A.   I DON'T REMEMBER THE EXACT DATES BUT I RECALL BEING TOLD

6   THAT HE DID.

7   Q.   OKAY.

8   A.   (INAUDIBLE)

9   Q.   ALL RIGHT.  ARE YOU AWARE OF HIS PROBATION WAS TERMINATED

10  IN 2014 ON THAT COOPERATING AGREEMENT?

11  A.   YES.

12  Q.   OKAY.  AND IT WAS TERMINATED SUCCESSFULLY, CORRECT?

13  A.   I JUST RECALL IT WAS TERMINATED.

14  Q.   OKAY.  NOW, YOU'RE AWARE THAT IN THE TASK FORCE THAT HE WAS

15  COOPERATING WITH IT DEALT WITH THE USE OF CHECK CASHING STORES

16  FOR PURPOSES OF UNEMPLOYMENT COMPENSATION FRAUD; YOU'RE AWARE

17  OF THAT?

18  A.   I DON'T REMEMBER THE DETAILS.  I WASN'T INVOLVED IN THAT

19  CASE.

20  Q.   OKAY.  YOU HAVEN'T LOOKED INTO WHAT HIS COOPERATION DEALT

21  WITH?

22  A.   I VAGUELY REMEMBER IT DEALT WITH SOME CHECKS COMING TO THE

23  STORE.

24  Q.   OKAY.  BUT MY QUESTION IS, HAVE YOU -- HAVE YOU

25  INVESTIGATED THE TERMS AND THE EXTENT OF HIS COOPERATION WITH

1 THE TASK FORCE IN MIAMI-DADE COUNTY?

2 A.  NO.

3 Q.  HAVE YOU QUESTIONED OR DETERMINED WHO WERE THE AGENTS IN

4 THAT TASK FORCE THAT MR. SUAREZ WAS WORKING WITH?

5 A.  YES.  LET ME ALSO ADVISE THAT THERE WERE OTHER AGENTS WHO

6 WERE INVOLVED IN THAT ASPECT OF THE INVESTIGATION FROM IRS.  SO

7 -- AT THAT POINT IN THE INVESTIGATION.

8 Q.  OKAY.  NOW, WE WERE TOLD THAT -- IN YOUR AFFIDAVIT IT

9 STATED THAT MR. SUAREZ CONTROLLED THREE CHECK CASHING STORES?

10 A.  YES.

11 Q.  OKAY.  BUT HE ACTUALLY HAD TO PAY SOMEBODY TO GET THE BANK

12 STATEMENTS IN ORDER TO SEE WHAT THE TRANSACTIONS WERE?

13 A.  YES.

14 Q.  OKAY.  NOW, ARE YOU AWARE OR ARE YOU FAMILIAR WITH THE FACT

15 THAT IN SEPTEMBER OF 2013, MR. SUAREZ MET WITH A DEA AGENT?

16 A.  NO.

17 Q.  ARE YOU AWARE ON MAY 14TH, 2014, THAT THERE WAS A MEETING

18 WITH A FEDERAL AGENT AS WELL AS ONE OTHER TASK FORCE AGENTS?

19 A.  I KNOW THAT AGENTS FROM THE IRS CONTACTED HIM IN THE PAST,

20 BUT --

21 Q.  OKAY.  BUT YOU DO NOT KNOW WHAT EXCHANGE OF INFORMATION IF

22 ANY THERE WAS WITH THOSE IRS AGENTS?

23 A.  I BELIEVE IT WAS SUBPOENAS.

24 Q.  OKAY.  AND ARE YOU AWARE AS TO WHETHER OR NOT MR. SUAREZ

25 ACTUALLY DROVE TO NEW JERSEY TO MEET AGENTS FROM NEW JERSEY IN

1  ORDER FOR INVESTIGATIONS IN THE UNEMPLOYMENT AND THE

2  (UNINTELLIGIBLE) COMPENSATION FRAUD?

3  A.  NO, I'M NOT AWARE.

4  Q.  OKAY.  NOW, THERE WERE THREE CHECK CASHING STORES; ONE WAS

5  NAMED MINIMALIST, DONE KOKY AND THE OTHER ONE DOGER?

6  A.  YES.

7  Q.  OKAY.  ALL OF THOSE -- ALL OF THOSE CHECK CASHING STORES

8  WERE CLOSED EARLY ON IN 2015, CORRECT?

9  A.  I THINK SO.

10  Q.  OKAY.  NOW, THE CHECKS THAT WENT FROM MINIMALIST WENT TO A

11  CORPORATION THAT MR. SUAREZ OWNED HIMSELF, CORRECT?

12  A.  I BELIEVE SO.

13  Q.  AND IT WAS (UNINTELLIGIBLE) UNDER HIS NAME, CORRECT?

14  A.  I BELIEVE SO.

15  Q.  OKAY.  NOW, THERE WAS -- IN YOUR AFFIDAVIT WHEN YOU TALK

16  ABOUT CERTAIN PROPERTIES THAT ARE OWNED BY EAST COAST

17  PROPERTIES, EAST COAST PROPERTIES IS A CORPORATION IN FLORIDA,

18  CORRECT?

19  A.  I BELIEVE SO, YES.

20  Q.  OKAY.  AND HAVE YOU SUBPOENAED ANY TRUST AGREEMENTS BETWEEN

21  EAST COAST PROPERTY AND THE ULTIMATE BENEFICIARIES OF THE

22  PROPERTIES?

23  A.  I HAVE NOT DIRECTLY BUT I DON'T KNOW IF IT HAS BEEN DONE BY

24  OTHER AGENTS.

25  Q.  HAVE YOU SEEN ANY TRUST AGREEMENTS BETWEEN EAST COAST

1  PROPERTY AND THE ULTIMATE BENEFICIARIES?

2  A.  NO.

3  Q.  HAVE YOU SEEN ANYTHING THAT WOULD INDICATE, ANY DOCUMENT

4  THAT HAS MR. SUAREZ'S NAME AS BEING THE BENEFICIARY OF THOSE

5  PROPERTIES, BENEFICIARY AGREEMENT?

6  A.  I HAVE NOT SEEN THEM, NO.

7  Q.  HAVE YOU SEEN -- IN YOUR AFFIDAVIT YOU REFER TO THE EAST

8  COAST PROPERTY AS A SHELL COMPANY?

9  A.  YES.

10  Q.  HAVE YOU SEEN THE BANK STATEMENTS FOR EAST COAST

11  PROPERTIES?

12  A.  I HAVE NOT.

13  Q.  HAVE YOU SEEN IF IT HAS NORMAL OPERATING CURRENT

14  TRANSACTIONS?

15  A.  I HAVE NOT BUT THERE HAVE BEEN OTHER PEOPLE INVESTIGATING

16  (INAUDIBLE)

17  Q.  BUT YOU HAVE ABSOLUTELY NO IDEA.

18  A.  NO.

19  Q.  OKAY.  AND THERE WAS SOME TESTIMONY OR IN THE PROFFER ABOUT

20  A -- A TELLER THAT CHANGED HER TESTIMONY IN 2017, IS THAT

21  CORRECT?

22  A.  YES.

23  Q.  OKAY.  AND THAT TELLER WORKED FOR MINIMALIST?

24  A.  I DON'T REMEMBER THE STORE BUT THAT PERSON WORKED FOR

25  MR. SUAREZ.

1   Q. OKAY. BUT YOU DON'T RECALL WHICH STORE?

2   A. I THINK IT WAS MINIMALIST.

3   Q. OKAY. AND THERE --

4   A. I WOULD HAVE TO LOOK (INAUDIBLE)

5   Q. AND SHE SAID THAT SHE WAS AFRAID OF LOSING HER JOB IN

6   JANUARY OF 2015, CORRECT?

7   A. YES.

8   Q. OKAY. DIDN'T MINIMALIST CLOSE IN 2014?

9   A. I DON'T RECALL WITHOUT LOOKING AT THE NOTES.

10   Q. AND, SIR, IN YOUR TESTIMONY -- IN YOUR TESTIMONY -- NOT IN

11   YOUR TESTIMONY. IN YOUR AFFIDAVIT YOU STATED THAT IN THIS

12   MEETING WHERE THESE WITNESSES WERE INSTRUCTED TO LIE THERE WAS

13   AN ATTORNEY PRESENT?

14   A. YES.

15   Q. HAVE YOU SEEN THE COOPERATING AGREEMENT THAT MR. SUAREZ HAD

16   WITH THE STATE OF FLORIDA?

17   A. NO.

18   Q. DID YOU REQUEST TO SEE THE COOPERATING AGREEMENT THAT

19   MR. SUAREZ HAD WITH THE STATE OF FLORIDA?

20   A. I BELIEVE THE AGENT WHO WAS INVESTIGATING THAT AT THE TIME

21   REQUESTED IT.

22   Q. BUT YOU HAVEN'T BOTHERED TO LOOK AT IT.

23   A. I DON'T RECALL SEEING IT.

24       MR. GARCIA-MONTES: I HAVE NOTHING FURTHER.

25       THE COURT: OKAY. ANY REDIRECT?

1               MR. BERGER:  JUST BRIEFLY.

2                    REDIRECT EXAMINATION

3  BY MR. BERGER:

4  Q.  TO YOUR KNOWLEDGE DID ANYONE FROM LAW ENFORCEMENT AUTHORIZE

5  THE DEFENDANT TO CASH FRAUDULENT TAX REFUND CHECKS?

6  A.  NO.

7  Q.  DID ANYONE FROM LAW ENFORCEMENT AUTHORIZE THE DEFENDANT TO

8  CASH FRAUDULENT HEALTH CARE CHECKS?

9  A.  NO.

10 Q.  HOW ABOUT FRAUDULENT MORTGAGE CHECKS?

11 A.  NO.

12             MR. BERGER:  NOTHING FURTHER.

13             THE COURT:  ALL RIGHT.  YOU CAN STEP DOWN, SIR.

14             IS THERE ANY OTHER EVIDENCE OR ARE WE GOING INTO

15 ARGUMENT FROM THE GOVERNMENT?

16             MR. BERGER:  NOT FROM THE GOVERNMENT.

17             THE COURT:  OKAY.

18             ANY EVIDENCE, SIR?

19             MR. GARCIA-MONTES:  NO, YOUR HONOR.

20             THE COURT:  OKAY.

21             SO LET ME HEAR THE GOVERNMENT'S ARGUMENT.

22             MR. BERGER:  YOUR HONOR, THE DEFENDANT IS NOT A UNITED

23 STATES CITIZEN, HE IS A CITIZEN OF CUBA THAT CAME HERE IN 1995.

24             HE WAS -- AFTER COMING HERE, SHORTLY THEREAFTER IN TWO

25 THOUSAND AND -- IN 2000 HE WAS ARRESTED FOR UNAUTHORIZED ACCESS

1 DECIDE FRAUD, SENTENCED TO 12 MONTHS IMPRISONMENT, AND THERE

2 WAS AN ORDER OF DEPORTATION ISSUED AGAINST THE DEFENDANT FROM

3 THAT FEDERAL CONVICTION.

4          AFTER THAT HE WAS ARRESTED, ALTHOUGH IT WAS DROPPED

5 FOR SOME DEALING IN STOLEN PROPERTY.  BUT MORE IMPORTANTLY HE

6 WAS SUBSEQUENTLY ARRESTED IN 2012 FOR ORGANIZED FRAUD, WORKERS

7 COMPENSATION FRAUD, MONEY SERVICES FRAUD, 33 COUNTS ON A STATE

8 CASE BASICALLY INVOLVING CASHING WORKERS COMP CHECKS.

9          ONCE HE GETS PUT ON PROBATION, WHICH IS HE GOT CHARGED

10 IN OCTOBER OF 2012, HE JUST TOOK THE STORE, PUT IT IN NOMINEES

11 AND THEN TOOK THESE STORES TO -- PUT THEM ON (UNINTELLIGIBLE)

12 ESSENTIALLY WHERE THEY WERE CASHING ENORMOUS, ENORMOUS SUMS OF

13 FRAUDULENT CHECKS --

14          THE COURT:  WAS THE 2012 CONVICTION ABOUT USING THESE

15 SAME STORES?

16          MR. BERGER:  ONE OF THE STORES WAS HIS -- WAS THE

17 STORE THAT HE WAS -- HIS PRIMARY STORE WHICH IS LOCATED ON WEST

18 76TH.

19          THE COURT:  AND HIS USE OF HIS -- I SEE UTTERING

20 CHECKS, MONEY SERVICE, FALSE ENTRY FRAUD, I GATHER, IS THE 2012

21 CONVICTION INVOLVES THIS GENTLEMAN'S USE OF ONE OF THOSE

22 STORES?

23          MR. BERGER:  CORRECT.

24          I MEAN, HE COULDN'T PUT IT IN HIS NAME BECAUSE HE'S A

25 FEDERAL FELON SO HE HAD IT IN HIS WIFE'S NAME BUT HE WAS

1    RUNNING THE DAY-TO-DAY --

2          THE COURT:  IN 2012 IT WAS IN HIS WIFE'S NAME.

3          MR. BERGER:  IN 2012 IT WAS IN HIS WIFE'S NAME

4    BECAUSE --

5          THE COURT:  I SEE.

6          MR. BERGER:  -- HE WAS A FEDERAL FELON SO HE COULDN'T

7    OWN A CHECK CASHING STORE.  BUT HE WAS RUNNING BASICALLY

8    WORKERS COMP FRAUD AND VARIOUS OTHER FRAUD THROUGH THAT CHECK

9    CASHING STORE.

10          AND WHILE HE'S ON PROBATION --

11          THE COURT:  FOR THE 2012 CASE.

12          MR. BERGER:  FOR THE 2012 CASE.

13          IN 2013 AND 2014 HIS THREE STORES CASHED 500 MILLION

14    DOLLARS --

15          THE COURT:  AH-HUH.

16          MR. BERGER:  -- IN FRAUDULENT CHECKS.

17          THE COURT:  BUT YOU'RE SAYING THAT AFTER HIS ARREST IN

18    OCTOBER OF 2012 THE ONE STORE THAT WAS INVOLVED IN THOSE 2012

19    CHARGES HE THEN CHANGED THE NAME -- HE SOMEHOW ARRANGEMENTS

20    WERE MADE FOR THE NAME -- THE NAME TO GO FROM HIS WIFE TO SOME

21    THIRD PARTY.

22          MR. BERGER:  CORRECT.

23          THE COURT:  GOT IT.

24          MR. BERGER:  BUT THE TELLERS REMAINED THE SAME AND THE

25    STORE KEPT OPERATING ESSENTIALLY IN THE SAME MANNER.

```
 1             I WOULD NOTE THAT --

 2             THE COURT:  WHAT'S THIS STORY WITH HIS COOPERATING

 3   WITH LAW ENFORCEMENT AT THE TIME?

 4             MR. BERGER:  YEAH.  I MEAN -- WELL, I WON'T GO INTO

 5   EVERYTHING ABOUT IT BUT THERE WAS A WORKERS COMP TASK FORCE,

 6   AND THE WORKERS COMP TASK FORCE WOULD OCCASIONALLY GET LEADS

 7   ABOUT CONSTRUCTION COMPANY SHELL OWNERS THAT WERE PICKING UP

 8   LARGE VOLUMES OF CHECKS.

 9             THEN THE WORKERS COMP TASK FORCE WOULD PULL THESE

10   PEOPLE OVER AND TAKE -- A LOT OF TIMES THESE WERE LIKE SEIZURES

11   OF MONEY.  THERE WERE MAYBE FIVE OR SIX CASES OF WORKERS COMP

12   RELATED FRAUD.  THOSE DETECTIVES HAD VERY LIMITED RECORDS BUT

13   THEY WERE CRISTAL CLEAR THAT THEY DID NOT AUTHORIZE HIM TO DO

14   ACTIVITY THAT INVOLVED IDENTITY THEFT, MORTGAGE FRAUD, HEALTH

15   CARE -- THEY DIDN'T AUTHORIZE HIM IN ANY WAY.

16             THE COURT:  SO ARE YOU SAYING THAT HE WAS COOPERATING

17   WITH SOME OTHER LAW ENFORCEMENT OFFICERS AT THE SAME TIME HE

18   WAS COMMITTING THIS OFFENSE KIND OF BEHIND THEIR BACK.

19             MR. BERGER:  CORRECT.

20             THE COURT:  THAT'S WHAT I THOUGHT I HAD BEEN HEARING.

21             MR. BERGER:  YES.

22             THE COURT:  OKAY.

23             MR. BERGER:  I WOULD NOTE THAT HIS EXPOSURE IS

24   SUBSTANTIAL --

25             THE COURT:  WHAT DOES THAT MEAN?  WHAT'S THE ADVISORY
```

 1 | GUIDELINES?

 2 | MR. BERGER:  THE ADVISORY GUIDELINES ON A -- WITHOUT A

 3 | PLEA, ON A TRIAL WOULD BE 360 TO LIFE GIVEN THE VOLUME OF --

 4 | GIVEN HIS CRIMINAL HISTORY --

 5 | THE COURT:  RIGHT.

 6 | MR. BERGER:  -- GIVEN THE VOLUME OF CHECKS THAT WERE

 7 | CASHED, GIVEN THE MONEY LAUNDERING GUIDELINES RAMP UP QUICKLY.

 8 | I WOULD ALSO NOTE THAT GIVEN THE OBSTRUCTION

 9 | CONDUCT -- GIVEN THE FACT THAT HE'S NOT A U.S. CITIZEN, THAT

10 | HE'S -- HE HAS A HISTORY OF COMMITTING OFFENSES HERE WHILE ON

11 | PROBATION, AND THAT HE FACES MASSIVE EXPOSURE, AND THAT HE'S

12 | OBSTRUCTED JUSTICE, ALL THOSE FEATURES COMBINED MAKES IT SO

13 | THAT THERE IS NO REAL CONDITIONS THAT THE GOVERNMENT WOULD FEEL

14 | COMFORTABLE WITH SETTING THAT WOULD ALLOW THE DEFENDANT TO BE

15 | OUT ON BOND.

16 | THE COURT:  AND YOU'RE SAYING SPECIFICALLY THAT HE'LL

17 | SHOW UP.

18 | MR. BERGER:  THAT HE --

19 | THE COURT:  YOU'RE ONLY LIMITING YOUR ARGUMENT TO

20 | FLIGHT.

21 | MR. BERGER:  YES.  RIGHT.

22 | THE COURT:  OKAY.

23 | OKAY.  I UNDERSTAND THE ARGUMENT.

24 | MR. GARCIA-MONTES?

25 | MR. GARCIA-MONTES:  YOUR HONOR, HERE IS THE ISSUE.

1    NUMBER ONE, MR. SUAREZ WAS COOPERATING WITH THE TASK
2  FORCE.

3    THE COURT:  HOW LONG HAS THIS COULD HAVE BEEN?
4    MR. GARCIA-MONTES:  FROM TWENTY -- HE WAS COOPERATING
5  FOR -- FROM 2012 THROUGH 2014 WHEN THE FEDERAL GOVERNMENT ASKED
6  THE STATE TO TERMINATE HIS PROBATION.  HIS PROBATION WAS
7  TERMINATED SUCCESSFULLY.

8    SECONDLY --

9    THE COURT:  BUT HE'S COOPERATING -- I BELIEVE YOU ALL
10  ACCEPT AS TRUE THAT HE WAS OUT OF HIS 2012 CONVICTION CAME, AN
11  OFFER ON HIS PART OF SOME AGREEMENT FOR HIM TO PROVIDE
12  INFORMATION.  THAT'S WHAT I'M HEARING, RIGHT, TO COOPERATE WITH
13  A LAW ENFORCEMENT INVOLVED IN THAT CASE?

14    MR. GARCIA-MONTES:  THAT IS CORRECT.

15    THE COURT:  OKAY.  AND WHAT WE'RE HEARING IS
16  CONSIDERABLE EVIDENCE THAT WHILE HE'S COOPERATING WITH THAT
17  GROUP OF LAW ENFORCEMENT HE'S ENGAGING IN REALLY KIND OF AN
18  ASTOUNDING AMOUNT OF FRAUD.

19    SO HOW TRUTHFUL IS HE BEING WITH LAW ENFORCEMENT?
20    MR. GARCIA-MONTES:  BECAUSE HE WAS REPORTING THE
21  CHECKS THAT HE WAS RECEIVING.

22    THE WHOLE POINT IS THEY HAVE VERY -- COUNSEL SAID THAT
23  -- THE GOVERNMENT SAID THEY HAVE VERY LIMITED RECORDS.
24  MR. SUAREZ IS MOST RESPONSIBLE FOR THEIR LIMITED RECORDS, BUT
25  THE FACT OF THE MATTER IS A COUPLE OF THINGS THAT SIMPLY DON'T

1 MAKE SENSE.

2       THE FIRST ONE IS, YOUR HONOR, IS THAT MINIMALIST IS A

3 STORE THAT WAS UNDER HIS WIFE'S NAME AND THEN IT WAS UNDER

4 SOMEBODY ELSE'S NAME.  LAW ENFORCEMENT KNEW THAT HE HAD CONTROL

5 OVER IT, BUT YET WE'RE HEARING THAT HE'S ASKING THE GRAND

6 JURY -- IF HE'S ASKING WITNESSES FOR A GRAND JURY TO SAY THAT

7 HE WAS NOT INVOLVED.  WELL, THAT CONTRADICTS WHAT LAW

8 ENFORCEMENT ALREADY KNEW.  LAW ENFORCEMENT AND THE TASK FORCE

9 KNEW THAT HE HAD CONTROL OF MINIMALIST.  THAT'S NUMBER ONE.

10       NUMBER TWO, MINIMALIST (UNINTELLIGIBLE) AND SO, IT

11 DOESN'T MAKE SENSE THAT HE WAS INSTRUCTING PEOPLE TO LIE AND

12 THAT PERSON SAID, OH, I WAS AFRAID OF LOSING MY JOB FOR A STORE

13 THAT'S ALREADY CLOSED.

14       ADDITIONALLY, YOUR HONOR --

15       THE COURT:  SO ARE YOU TELLING ME, THOUGH, FOR

16 EXAMPLE -- I MEAN, THERE IS SO MUCH INFORMATION HERE THAT IT'S

17 HARD FOR ME TO PULL IT ALL TOGETHER.

18       BUT JUST PICKING SOMETHING.  CHECKS THAT WERE CASHED

19 OF UP TO $400,000 -- AND I DON'T OF ANYBODY IN A LEGITIMATE

20 BUSINESS WHO CASHES A CHECK IN THAT AMOUNT, RIGHT?  PEOPLE PUT

21 IT IN A BANK.

22       BUT ARE YOU TELLING ME THAT YOUR CLIENT WAS REPORTING

23 TO THESE LAW ENFORCEMENT OFFICERS THAT THESE CHECKS IN THESE

24 EXTRAORDINARY AMOUNTS WERE BEING CASHED AT THESE STORES HE HAD

25 INVOLVEMENT IN AND THAT HE WAS GETTING A CUT OF THE FEE?

1           MR. GARCIA-MONTES:  YES, MA'AM.

2           THE COURT:  HE WAS TELLING THEM ALL THAT.

3           MR. GARCIA-MONTES:  HE WAS INFORMING ALL OF THEM, YES.

4           THE COURT:  AND THAT WHAT ARE YOU SAYING THOSE LAW

5    ENFORCEMENT OFFICERS SAID ABOUT THAT?

6           MR. GARCIA-MONTES:  JUDGE, THEY DID NOT TELL HIM TO

7    STOP.  HE WAS NOT TOLD TO STOP YOUR ACTIVITY.  THEY WERE --

8    THESE AGENTS, AND THERE WERE -- AND THEY WERE FEDERAL AGENTS

9    INVOLVED IN THE TASK FORCE AS WELL.  THE AGENT -- THE TASK

10   FORCE LATER ON BROKE UP, BROKE UP -- I CAN ACTUALLY TELL YOU.

11          THE TASK FORCE BROKE UP AT A LATER POINT AND EVELIO

12   CONTINUED OPERATING WITH BROWARD COUNTY BUT HE WAS REPORTING

13   HIS ACTIVITIES TO HIS SUPERVISING AGENTS.

14          THE TASK FORCE BROKE UP IN APRIL OF 2014.

15          THE COURT:  SO CHECKS THAT WERE MADE OUT BY THE IRS IN

16   AMOUNTS OF OVER A HUNDRED GRAND TO SOME PERSON WHO'S -- THE

17   NAME OF THE PAYEE CAME FROM USING STEALING SOMEONE'S IDENTITY,

18   YOU'RE SAYING YOUR CLIENT TOLD THOSE LAW ENFORCEMENT OFFICERS

19   THAT HE WAS -- HAD SOME AFFILIATION WITH THESE CHECKS BEING

20   CASHED AND HE WAS GETTING A FEE FROM THAT AND THEY SAID,

21   OKEY-DOKEY?

22          MR. GARCIA-MONTES:  AND THEY DID NOT -- HE REPORTED IT

23   AND THEY DID NOT TELL HIM, DO NOT EXCEPT ANY OF CHECKS, DO

24   NOT -- DO NOT CONTINUE DOING THAT BECAUSE PART OF THE ISSUE WAS

25   THEY WANTED HIM TO CONTINUE OPERATING IN THE -- IN THE CHECK

1  CASHING STORES IN ORDER TO GET THE UNEMPLOYMENT COMPENSATION

2  WHICH IS WHAT THEY WERE CONCERNED WITH.

3       MR. SUAREZ'S UNDERSTANDING WAS THAT THE INFORMATION

4  WAS GOING TO DIFFERENT AGENCIES AND THAT IT WAS BEING FILTERED

5  THROUGH THE AGENTS HE SPOKE.  HE FIRST SPOKE WITH AN FBI AGENT

6  IN 2015, HE SPOKE TO A DEA ACT IN 2014.

7       MORE IMPORTANTLY, YOUR HONOR, MR. SUAREZ HAS KNOWN --

8  INSOFAR AS THE RISK OF FLIGHT -- AND THIS IS WHAT THE

9  GOVERNMENT IS MOVING ON.  MR. SUAREZ HAS KNOWN SINCE AT LEAST

10 JANUARY OF 2015 THAT THERE WAS SOME FORM OF AN INVESTIGATION,

11 SOME FORM OF AN INDICTMENT.

12      HIS PROBATION WITH THE STATE WAS TERMINATED

13 SUCCESSFULLY BUT THE OTHER SIDE, DO NOT COOPERATE ANY MORE WITH

14 ANYONE.  AND THAT'S WHAT THE ORDER SAYS.  AND HE SAYS, DO NOT

15 BE ENGAGED WITH ANY CHECK CASHING STORES.  AND THAT'S WHAT WE

16 HEARD LATER ON THAT NEXT YEAR THOSE GO CHECK CASHING STORES

17 WERE CLOSED.

18      MR. SUAREZ KNOWS -- KNEW PERFECTLY WELL FROM 2015 THAT

19 AN INVESTIGATION INTO HIM WAS GOING ON, THAT APPARENTLY

20 SOMEBODY WAS INVESTIGATING WHAT WAS GOING ON WITH THOSE OTHER

21 CHECKS.

22      MOREOVER, IN 2017 I HAD AN E-MAIL EXCHANGE AND

23 CONVERSATIONS EXCHANGED WITH THE GOVERNMENT WHERE THEY TOLD ME,

24 WE ARE --

25      THE COURT:  WHO IS THE GOVERNMENT?

1          MR. GARCIA-MONTES:  I'M SORRY.  WITH MR. BERGER.

2          THE COURT:  OKAY.

3          MR. GARCIA-MONTES:  AS TO, YOU KNOW, WE'RE

4 INVESTIGATING HIM, WE'RE GETTING READY.  I WOULD LIKE YOU TO

5 COME IN.  AND AT THAT POINT WE SAID, NO.  BUT FROM JUNE OR

6 MARCH OF 2017, YOUR HONOR, I CAN TELL YOU FOR A FACT THAT

7 MR. SUAREZ KNEW THIS CASE IS -- THEY'RE GETTING READY TO INDICT

8 YOU.  THEY'RE ON YOU.

9          IF HE HAD ACCESS TO ALL THESE FUNDS, HE HAD ALL THESE

10 PROPERTIES THAT -- THAT THEY CANNOT SAY ARE HIS, IF HE HAD ALL

11 OF THAT, JUDGE, HE'D BE GONE A LONG TIME AGO.  THE FACT OF THE

12 MATTER IS MR. SUAREZ HAS NO FAMILY OUTSIDE OF THE UNITED

13 STATES.

14          AS IT STATES IN THE PRETRIAL SERVICES REPORT HIS

15 FAMILY -- THERE IS NO FAMILY IN CUBA WHICH IS WHERE HE'S FROM.

16 HE'S BEEN HERE SINCE -- YOUR HONOR, HE'S BEEN IN THIS COMMUNITY

17 FOR OVER 23 YEARS.  HE HAS HIS DAUGHTER WHO IS PRESENT HERE.

18 SHE CAME FROM TAMPA.  HE HAS FRIENDS, MR. GEORGE LEVA WHO IS

19 WILLING TO CO-SIGN ON HIS BEHALF.

20          AND TO SAY THAT THERE IS NO CONDITION OF RELEASE THAT

21 WILL MAKE SURE THAT HE RETURNS, JUDGE, I CAN TELL YOU AS OF

22 MARCH OF 2017 OVER A YEAR AGO MR. SUAREZ HAD MR. BERGER TELLING

23 HIM, I'M GOING TO INDICT YOU.  SO WHERE IS THE RISK OF FLIGHT?

24 HE KNEW THIS WAS COMING.  HE KNEW PERFECTLY WELL IT WAS COMING.

25          SO HOW CAN WE SAY THAT HE'S A RISK OF FLIGHT?  BE ON A

1  CURFEW, DO EXACTLY WHAT THE PRETRIAL SERVICES REPORT SUGGESTS

2  IN WHICH I CONCUR --

3          THE COURT:  I LOOKED AT THAT.

4          THE PROBLEM IS THEY DON'T HAVE ANY OF THIS INFORMATION

5  WE'VE HEARD HERE TODAY.

6          THEY MET YOUR CLIENT IN THE LOCKUP THE MORNING HE WAS

7  ARRESTED, GET HIS BACKGROUND HISTORY, KNOW THE NAME OF THE

8  CHARGE BUT NOT THE CIRCUMSTANCES.

9          SO IT'S REALLY NOT FAIR TO EXPECT THAT THEY WOULD --

10  TO RELY UPON THE RECOMMENDATION THEY MADE THAT'S NOT FULLY

11  INFORMED.  SO I DON'T FEEL GUIDED BY THAT AT ALL.

12          MR. GARCIA-MONTES:  I UNDERSTAND, YOUR HONOR.  I'M

13  JUST USING IT AS A REFERENCE FOR PURPOSES OF, THIS IS NOT A

14  PERSON -- THIS IS A PERSON IF THAT HE -- IF HE WAS GOING TO

15  FLEE HE WOULD HAVE FLED A LONG TIME AGO.

16          THE COURT:  OKAY.

17          MR. GARCIA-MONTES:  HE HAS NO INTEREST IN FLEEING.  HE

18  HAS NO --

19          THE COURT:  SO WHAT BOND ARE YOU SUGGESTING?

20          MR. GARCIA-MONTES:  YOUR HONOR, I WOULD SAY A HUNDRED

21  THOUSAND CORPORATE SURETY OR THE BOND THAT YOUR HONOR FEELS

22  (UNINTELLIGIBLE) AND HOME CONFINEMENT WITH -- AND TO ALLOW HIM

23  TO WORK AT THE BAKERY AND SEEING HIS ATTORNEY.

24          THE COURT:  OKAY.

25          ANY REBUTTAL, BRIEFLY?

1          MR. BERGER:  YEAH.  BRIEFLY.

2          I MEAN, FIRST, THIS WAS A WORKERS COMP TASK FORCE AND

3   THEY WILL SAY UNEQUIVOCALLY THAT THEY NEVER HEARD ABOUT OR

4   AUTHORIZED ANY OF THIS, AS THAT WAS THE TESTIMONY FROM THE

5   AGENT.  HEALTH CARE, MORTGAGE FRAUD, TAX REFUND FRAUD.

6          SECONDLY I WOULD NOTE THAT THE DEFENDANT, ALTHOUGH

7   HE'S KNOWN ABOUT IT, I HIGHLIGHT THE FACT THAT HE DID

8   DELIBERATELY DIRECT KEY WITNESSES NOT TO TESTIFY TRUTHFULLY

9   WHICH MAKES A CASE DIFFICULT WHEN THERE ARE A NUMBER OF

10  DIFFERENT WITNESSES -- WHEN YOU HAVE FIVE DIFFERENT WITNESSES,

11  ALL THE TELLERS, WHO ARE SAYING ONE THING IN GRAND JURY

12  TESTIMONY AND THEN YOU'VE GOT OTHER PEOPLE SAYING SOMETHING

13  ELSE, IT MAKES IT DIFFICULT FOR THE GOVERNMENT TO PROCEED IN A

14  CASE.

15         IT ALSO SHOWS THE RISKS OF THERE PARTICULAR DEFENDANT

16  OF WHAT HE DID --

17         THE COURT:  YOU HAVE ONE WITNESS WHO SAID SHE WAS TOLD

18  TO TESTIFY FALSELY?

19         MR. BERGER:  CORRECT.

20         THE COURT:  AH-HUH.

21         WHAT ABOUT THIS -- WHAT ABOUT THE ARGUMENT THAT THE

22  DEFENDANT KNEW YOU WERE GOING TO INDICT HIM?

23         MR. BERGER:  YEAH.  AND I WOULD NOTE THAT -- AND IT'S

24  BEEN -- THIS CASE HAS BEEN GOING ON FOR A LITTLE WHILE.  BUT

25  THERE WAS A PERIOD OF TIME WHERE THE DEFENDANT WAS NOT

1   RESIDING -- AND EVEN IN THIS RESIDENCE, IT'S NOT LIKE HE KEEPS

2   A RESIDENCE IN HIS OWN NAME --

3           THE COURT:  RIGHT.

4           MR. BERGER:  -- WHERE IT'S EASY TO FIND WHERE THE

5   DEFENDANT IS RESIDING.

6           AND I THINK THERE'S A HUGE DIFFERENCE BETWEEN BEING

7   UNDER INVESTIGATION AND ACTUALLY BEING FEDERALLY, FORMALLY

8   CHARGED WITH SOMETHING.

9           THE COURT:  RIGHT.

10          MR. BERGER:  WHEN YOU HAVE THE EXPOSURE THAT YOU HAVE,

11  YOU HAVE THE HISTORY THAT YOU HAVE OF CRIMINAL CONVICTIONS, YOU

12  HAVE THE OBSTRUCTION OF JUSTICE AND YOU HAVE THE ORDER OF

13  DEPORTATION I DON'T THINK THAT THERE IS A REASONABLE BOND THAT

14  COULD BE SET THAT WOULD ENSURE THE PRESENCE OF THE DEFENDANT.

15          THE COURT:  AH-HUH.

16          MR. BERGER:  AND ESPECIALLY HERE.  EVEN -- I MEAN, THE

17  ASSETS -- HE DOESN'T EVEN SHOW ANY ASSETS --

18          THE COURT:  RIGHT.

19          MR. BERGER:  -- THAT COULD EVEN BE PUT UP IN HIS OWN

20  NAME.  SO I DON'T SEE HOW SOME -- I MEAN, HE REPORTS A NEGATIVE

21  NET WORTH OF $50,000.

22          THE COURT:  RIGHT.  RIGHT.

23          OKAY.  SO, MR. SUAREZ, I THINK THE GOVERNMENT HAS

24  CARRIED ITS BURDEN OF PROOF, THAT'S A PREPONDERANCE OF THE

25  EVIDENCE IS WHAT THEY HAVE TO SHOW IF I'M TO DETAIN YOU AS A

1 RISK OF FLIGHT.  AND THAT'S REALLY, LEGALLY THAT'S THE QUESTION

2 THAT I'VE BEEN CONSIDERING HERE AS I LISTEN TO THE INFORMATION

3 THAT YOUR LAWYER AND THE GOVERNMENT LAWYER HAS GIVEN ME.

4 SO I'M GOING TO ORDER THAT YOU BE DETAINED WITHOUT

5 BOND.  LET ME GIVE YOU A LITTLE BIT OF MY REASONING IN DOING

6 SO.

7 THE BEST ARGUMENT IN YOUR FAVOR, SIR, I THINK IS THAT

8 YOU HAVE KNOWN YOU HAVE BEEN UNDER INVESTIGATION AND YOU

9 HAVEN'T FLED.  AND I REALLY THOUGHT ABOUT THAT BECAUSE

10 THAT'S -- THAT'S SOMETHING THAT IS IN THE PLUS COLUMN FOR YOU

11 AS I TRY TO WEIGH WHAT HAS THE GOVERNMENT SHOWN ME REGARDING A

12 BOND.

13 THE PROBLEM IS THERE IS SO MUCH IN THE MINUS COLUMN,

14 IF THAT MAKES ANY SENSE TO YOU.  THE FRAUD THAT YOU HAVE BEEN

15 ALLEGED TO BE INVOLVED IN IS HIGHLY SOPHISTICATED.  YOU HAVE

16 APPARENTLY SOME REAL SKILLS IN BASICALLY LAUNDERING MONEY, IN

17 USING FALSE IDENTIFICATIONS OF ESSENTIALLY I WOULD CALL IT

18 BRIBERY.  THAT'S NOT THE LEGAL CHARGE HERE, BUT PAYING A

19 KICKBACK, LET'S PUT IT THAT WAY, TO A BANK EMPLOYEE TO GIVE YOU

20 INFORMATION FOR WHICH YOU'RE NOT ENTITLED.

21 SO ENGAGING IN THAT KIND OF A RELATIONSHIP YOU

22 UNDERSTAND HOW FINANCIAL TRANSACTIONS WORK, IT WOULD SEEM TO

23 ME, AND YOU HAVE KNOWN HOW TO ENGAGE IN FRAUD IN A SIGNIFICANT

24 LEVEL.

25 TO THE EXTENT THAT YOU WERE COOPERATING WITH THE

1  WORKERS COMPENSATION TASK FORCE, IT SOUNDS TO ME LIKE YOU WERE

2  TWO-TIMING THEM, IS WHAT WE WOULD SAY.  THAT YOU'RE GIVING THEM

3  INFORMATION AND TRYING TO GET YOUR PROBATION TERMINATED EARLY

4  AND NOT MENTIONING THE MORTGAGE FRAUD, TAX FRAUD, HEALTH CARE

5  FRAUD, ET CETERA FOR WHICH I'VE BEEN GIVEN A PROFFER OF

6  CONSIDERABLE EVIDENCE.

7           AND LET ME SAY THIS TO YOU, MR. SUAREZ.  IN THE END I

8  DON'T KNOW IF YOU'RE GUILTY OR NOT.  I'M NOT THE ONE TO DECIDE

9  THAT TODAY.  ALL I CAN DO IS TAKE WHAT'S BEEN GIVEN TO ME TODAY

10 AND DO MY BEST IN ANALYZING IS THERE A BOND THAT CAN REASONABLY

11 ASSURE ME THAT YOU WILL SHOW UP.

12          AND WHAT'S BEEN PROFFERED TO ME IS THAT THERE ARE

13 MULTIPLE WITNESSES AND MULTIPLE FORMS OF EVIDENCE, THERE IS NOT

14 ONE COOPERATED -- UNCOOPERATIVE STATEMENT, FOR EXAMPLE.  SO

15 THIS -- THE VARIOUS KINDS OF EVIDENCE SHOW THAT YOU HAVE BEEN

16 ENGAGED IN FRAUD IN REALLY AN EXTRAORDINARY LEVEL.

17          YOU'VE HAD ACCESS TO A LOT OF MONEY.  THE FACT THAT

18 YOU HAVE SPENT $150,000 AT LOUI VUITTON BETWEEN 2013 AND THE

19 PRESENT IS A GOOD EXAMPLE OF THAT.  FEW PEOPLE ARE ABLE TO LIVE

20 THAT WAY AND HAVE THAT KIND OF -- MAKE THOSE KIND OF PURCHASES.

21          AND THE FACT THAT THERE IS A WITNESS WHO SOUNDS LIKE A

22 PRETTY VULNERABLE PERSON, A RECENT IMMIGRANT TO THIS COUNTRY

23 WHO WAS WORKING AT A CHECK CASHING STORE WHO WILL TESTIFY THAT

24 YOU BASICALLY SUBORNED HER FALSE TESTIMONY TO A GRAND JURY ALSO

25 SHOWS A LEVEL OF I WOULD USE THE WORD CHUTZPA, YOUR LAWYER

1  COULD EXPLAIN THAT TO YOU LATER, AND THE WAY THAT YOU'VE

2  ENGAGED IN THIS ALLEGED CRIMINAL ACTIVITY.

3       YOUR RESIDENCE NOW IS COMPLETELY UNSTABLE.  WHAT

4  YOU'VE TOLD PRETRIAL SERVICES IS THAT YOU ARE LIVING ALONE AT A

5  PLACE IN MIRAMAR, A HOME IN MIRAMAR THAT A FRIEND OWNS THAT THE

6  FRIEND IS TRYING TO SELL, YOU ARE NOT PAYING ANY RENT.  THERE

7  IS NO ATTACHMENT TO THAT RESIDENCE.

8       MY PUTTING YOU THERE ON ELECTRONIC MONITORING OR HOME

9  CONFINEMENT AS YOUR LAWYER SUGGESTS ISN'T MAKING ANY SENSE TO

10  ME.  IT'S NOT LIKE YOU OWN THAT HOME AND HAVE A LOT OF EQUITY

11  IN IT AND A LONGTIME OWNERSHIP THAT WOULD BE MAYBE A DIFFERENT

12  PICTURE.

13       YOU REPORT A VERY MINIMAL INCOME WORKING AT A BAKERY

14  WHICH MAY OR MAY NOT BE TRUE NOW.  I DON'T KNOW.  BUT IT'S

15  CERTAINLY -- YOU DON'T HAVE THE KIND OF JOB THAT WOULD BE A

16  REAL ANCHOR TO KEEP YOU HERE IN THIS COMMUNITY OR THE KIND OF

17  INCOME WITH WHICH YOU COULD SUPPORT A BOND.

18       OF COURSE, THAT CURRENT EMPLOYMENT AND RESIDENCE

19  DOESN'T REALLY ADD UP WITH THE KIND OF MONEY THAT YOU HAVE HAD

20  ACCESS TO.  PERHAPS YOU HAVE SPENT IT ALL.  I DON'T KNOW IF YOU

21  STILL HAVE IT OR NOT, BUT WITHOUT KNOWING IT'S A CONCERN, IT'S

22  IN THE MINUS COLUMN FOR ME WHETHER YOU STILL HAVE ACCESS TO

23  CONSIDERABLE WEALTH.

24       YOU'VE BEEN ORDERED REMOVED FROM THIS COUNTRY AND YOU

25  HAVE HEARD NOW IF CONVICTED YOU'RE ESSENTIALLY LOOKING AT A

 1 | GUIDELINE RECOMMENDED LEVEL THAT I THINK IS KIND OF A LIFE
 2 | SENTENCE.

 3 |      SO THE INCENTIVE NOW TO FLEE IS DRAMATICALLY DIFFERENT
 4 | FROM YOUR PRIOR CONVICTIONS, WHICH TO BE CLEAR ARE AS I PUT IT
 5 | IN THAT MINUS COLUMN OF CONCERN FOR ME BECAUSE BOTH INVOLVE
 6 | FRAUD FIRST IN 2000, FIVE YEARS AFTER YOU ARRIVE IN THIS
 7 | COUNTRY AND THEN IN 2012.  SO YOU HAVE A LONG HISTORY OF USING
 8 | PEOPLES IDENTIFICATION AND ACCESS DEVICES FRAUDULENTLY WITHOUT
 9 | THEIR PERMISSION AND DOING SO, YOU KNOW, TO GET MONEY,
10 | BASICALLY STEALING FROM PEOPLE IN A PRETTY SIGNIFICANT WAY.

11 |      SO FOR ALL THOSE REASONS I ORDER THAT YOU BE HELD IN
12 | DETENTION.

13 |      I ASK MR. BERGER TO PLEASE E-MAIL TO ME BEFORE YOU
14 | LEAVE TODAY A PROPOSED ORDER USING OUR FORM.  YOU'VE PROBABLY
15 | HEARD ME SPEAK ABOUT THE FORM THAT'S BEEN MODIFIED SO YOU CAN
16 | EXPAND THE NARRATIVE AT THE END.  YOU MIGHT WANT TO TAKE -- I
17 | THINK I HAVE UP HERE SOME PRIOR ORDERS.  BUT THEY'RE MERELY IS
18 | EXAMPLES TO SHOW THAT SOMETIMES I'VE GOTTEN THESE ORDERS WHERE,
19 | MR. BERGER, PEOPLE JUST CHECK OFF THE BOXES AND GIVE ME NO
20 | NARRATIVE AND THE STATUTE PLAINLY REQUIRES ME TO GIVE AN
21 | EXPLANATION.  SO I WOULD LIKE YOU TO SUMMARIZE IN THE ORDER
22 | WHAT I HAVE JUST GONE THROUGH HERE.  YOU DON'T NEED TO GIVE ALL
23 | THE DETAILS OF THE CRIME.  OKAY?

24 |      MR. BERGER:  SURE.

25 |      THE COURT:  DID WE DO ARRAIGNMENT?  I DON'T REMEMBER.

```
 1              MR. BERGER:  IT'S A COMPLAINT.  AND SO WE HAVE A -- I

 2  THINK IT SHOULD BE SET FOR --

 3              THE COURT:  RIGHT.

 4              THE CLERK:  (INAUDIBLE)

 5              THE COURT:  IT'S ON FOR THE 12TH?

 6              THE CLERK:  YES.

 7              THE COURT:  OKAY.  BECAUSE THE COVER SHEET HERE SAYS

 8  ARRAIGNMENT, BUT THAT'S WRONG.

 9              OKAY.  SO YOU'LL BE BACK ON THE 12TH FOR YOUR

10  ARRAIGNMENT.

11              ALL RIGHT.  THANK YOU VERY MUCH.

12                             - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2
 3                    C E R T I F I C A T E
 4
 5
 6  UNITED STATES OF AMERICA
 7  SOUTHERN DISTRICT OF FLORIDA
 8
 9
10        I, CARL SCHANZLEH, OFFICIAL COURT REPORTER OF THE UNITED
11  STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, DO
12  HEREBY CERTIFY THAT THE FOREGOING 42 PAGES CONSTITUTE A TRUE
13  TRANSCRIPT OF THE PROCEEDINGS HAD BEFORE THE SAID COURT HELD IN
14  THE CITY OF MIAMI, FLORIDA, IN THE MATTER THEREIN STATED.
15        IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS 3RD
16  DAY OF FEBRUARY 2019.
17
18                         /S/CARL SCHANZLEH
                           CARL SCHANZLEH, RPR-CM
19                         CERTIFIED COURT REPORTER
                           9960 SW 4TH STREET
20                         PLANTATION, FL 33324
                           TELEPHONE 954 424-6723
21
22
23
24
25
```